Slip Op. 00-67

# UNITED STATES COURT OF INTERNATIONAL TRADE

---

SHAKEPROOF ASSEMBLY COMPONENTS  :
DIVISION OF ILLINOIS TOOL WORKS, INC.,

         :

     Plaintiff,       **Court No. 97-12-02066**

         :   **Before: Barzilay, Judge**

   v.

         :

UNITED STATES,

         :

     Defendant.

         :

---

[Final results of redetermination on remand sustained.]  Decided: June 9, 2000

*Creskoff & Doram, L.L.P. (Stephen M. Creskoff, Robert T. Hume, Lisa E. Smilan)* for Plaintiff.

*David W. Ogden*, Acting Assistant Attorney General, *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Lucius B. Lau*), *Robert E. Nielsen*, Senior Attorney, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for Defendant.

## OPINION

**BARZILAY, JUDGE:**

### I. Background

This case provides another chapter in the evolution of methods for determining normal value in

cases where dumping has been alleged for products manufactured in nonmarket economies.[1]

---

[1]Normal value in market economy cases is generally the price at which the foreign product is first sold in the exporting country. *See* 19 U.S.C. § 1677b(a)(1)(B)(i) (1994). However, in nonmarket economies the statute directs the Department of Commerce ("Commerce") to value the merchandise on the basis of the factors of production. *See* 19 U.S.C. § 1677b(c) (1994). The export price (or constructed export price) is generally the price of the merchandise at importation after certain statutory

Before the Court is Commerce's *Final Results of Redetermination On Remand Pursuant to Shakeproof Assembly Components Division of Illinois Tool Works, Inc. v. United States*, Court No. 97-12-02066 ("Remand Determination"). Shakeproof Assembly Components ("Shakeproof") originally brought this case challenging certain aspects of the Department of Commerce, International Trade Administration's ("Commerce" or "ITA") final determination in *Certain Helical Spring Lock Washers from the People's Republic of China; Final Results of Antidumping Duty Administrative Review*, 62 Fed. Reg. 61794-801 (Nov. 19, 1997) ("Final Determination"). Commerce assigned Hangzhou Spring Washer Plant, subsequently known as Zhejian Wanxin Group, Co. ("ZWG"), a respondent in the original investigation, an individual dumping margin. On November 15, 1996, Commerce initiated the third annual review covering the period October 1, 1995 - September 30, 1996.[2] Commerce published its preliminary determination on July 11, 1997[3] and its Final Determination on November 19, 1997.[4]

Commerce's designation of China as a nonmarket economy went unchallenged; therefore, Commerce used a factors of production analysis, pursuant to 19 U.S.C. § 1677b(c) (1994), to determine the normal value for the helical spring lock washers ("washers") produced by ZWG. Commerce, without objection, chose India as the appropriate surrogate country pursuant to 19 U.S.C. § 1677b(c)(4). Plaintiff did challenge Commerce's use of the price paid for steel wire rod imported from the United Kingdom by

adjustments are made. *See* 19 U.S.C. §§1677a(a)-(b) (1994). The amount by which the normal value exceeds the export price or constructed export price is the dumping margin. *See* 19 U.S.C. § 1677(35)(A) (1994).

[2] *Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocation in Part,* 61 Fed. Reg. 58513 (Nov. 15, 1996).

[3] *Certain Helical Spring Lock Washers From People's Republic of China; Preliminary results of Antidumping Duty Administrative Review*, 62 Fed. Reg. 37192 (July 11, 1997).

[4] Final Determination, 62 Fed. Reg. 61794-801 (Nov. 19, 1997).

ZWG, accounting for 34.7 percent of ZWG's total purchases of steel wire rod during the period of review ("POR"), to value all steel wire rod. Additionally, Plaintiff argued that Commerce failed to verify the price information ZWG submitted and miscalculated the final dumping margin by using duplicative and aberrational data. Defendant agreed that a remand was required to enable Commerce to recalculate the value for steel scrap by eliminating duplicate total quantity and value figures for the period April 1995 - August 1995.

For the reasons discussed in *Shakeproof Assembly Components Division of Illinois Tool Works, Inc. v. United States*, 23 CIT —, 59 F. Supp.2d 1354 (1999) ("*Shakeproof I*"), the Court remanded the case to the agency to explain with reference to the record how the use of import price data for steel wire rod to value all steel wire rod, including domestically sourced rod, promoted accuracy in this case, to recalculate the steel scrap factor by eliminating duplicative data and certain import data which were aberrational, and to explain why good cause did not exist to verify the steel wire rod import price information submitted by the respondent.

In its Remand Determination, Commerce asserted that it complied with the Court's instructions. In its *Comments Respecting the Final Results of Redetermination on Remand, Submitted on Behalf of Shakeproof Assembly Components Division of Illinois Tool Works Inc.* ("*Pl.'s Comments*"), Plaintiff challenges Commerce's Remand Determination on several bases. Plaintiff first disputes Commerce's methodology, contending that Commerce unlawfully applied a rule not effective during the POR to the facts of this case. Hence, Shakeproof claims, Commerce did not apply relevant administrative and judicial precedent in its Remand Determination. Plaintiff further asserts that Commerce did not follow the Court's instruction to explain how its use of import prices to value the entire factor of production for steel wire rod promotes accuracy, with reference to the record. Finally, Plaintiff states that verification of ZWG's steel import prices was required.

Commerce reaffirms its contention that it complied with the Court's instructions in *Def.'s Comments in Rebuttal to Comments Respecting the Final Results of Redetermination on Remand, Submitted on Behalf of Shakeproof Assembly Components Division of Illinois Tool Works Inc.* ("Def.'s Comments"). Commerce states that it properly used import prices for domestically-purchased materials to promote accuracy, and that the agency properly determined that good cause did not exist to verify prices submitted by ZWG. Because the Court finds that Commerce's conclusions are both reasonable and supported by substantial evidence, the Court affirms the Remand Determination.

## II. DISCUSSION

### A.  Standard of Review

In reviewing a challenge to Commerce's determination in an antidumping administrative review, the Court is to hold unlawful a determination, finding or conclusion by Commerce that is unsupported by substantial evidence or otherwise not in accordance with law. *See* 19 U.S.C. § 1516a(b)(1)(B)(i) (1994). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *accord Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). "In applying this standard, the court affirms Commerce's factual determinations so long as they are reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusions." *Olympia Industrial, Inc. v. United States*, 22 CIT —, —, 7 F. Supp. 2d 997, 1000 (1998) ("*Olympia II*") (citing *Atlantic Sugar, Ltd. v. United States*, 2 Fed. Cir. (T) 130, 138, 744 F. 2d 1556, 1563 (1984)).

To determine whether Commerce has acted in accordance with law the court must ask whether the agency's actions were reasonable under the terms of the relevant statute. In *Shakeproof I*, the Court

noted that the relevant statute did not speak directly to the issue of any particular methodology Commerce must employ to value the factors of production, and that discretion was therefore vested in Commerce to develop the details of its methodology. 23 CIT at —, 59 F. Supp.2d at 1357. Thereafter, the Court proceeded to examine whether Commerce acted reasonably pursuant to the second step of the *Chevron* analysis. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc*. 467 U.S. 837, 843 (1984). The Court reserved judgment on the reasonableness of Commerce's action, and now reviews Commerce's Remand Determination for that purpose.

In the interim, however, the Supreme Court has revisited the issue of how much deference, and in what circumstances, a reviewing court owes to the actions of an executive agency. In *Christensen v. Harris County*, No. 98-1167, 2000 U.S. LEXIS 3003, at *19 (May 1, 2000), the Supreme Court refused to extend *Chevron* deference (courts must defer to an agency's interpretive regulation construing an ambiguous statute) to an opinion letter issued by the Department of Labor's Wage and Hour division because its interpretation of the statute at issue was "not one arrived at after, for example, a formal adjudication or notice-and-comment rulemaking." *Id.* Both the majority and dissenting opinions recognized that deference is accorded to agency interpretations embodied in formats other than formal adjudications and notice and comment rulemaking. Courts continue to apply deference based on how persuasive or authoritative the reviewing court finds the agency interpretations when compared to the statutory language.[5]

The preliminary question that the Court must answer is whether the *Christensen* opinion requires a change in the level of deference granted to such agency interpretations. Noting that only the majority opinion is binding, the Court finds that a brief analysis of the majority, concurring, and dissenting opinions

---

[5]*See Genesco v. United States*, No. 92-02-00084, 2000 Ct. Intl. Trade LEXIS 58 (May 23, 2000) (delineating the *Christensen* opinions' analyses of Chevron applicability).

is helpful in arriving at an accurate conclusion. The *Christensen* majority held that "interpretations contained in formats such as opinion letters are 'entitled to respect' under our decision in *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), but only to the extent that those interpretations have the 'power to persuade.'" *Id.* at 20 (citing *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 256-258 (1991)). Moreover, in response to the government's claim that the opinion letter should be given deference under *Auer v. Robbins*, 519 U.S. 452 (1997), the majority stated, "In *Auer*, we held that an agency's interpretation of its own regulation is entitled to deference. *Id.* at 461.... But *Auer* deference is warranted only when the language of the regulation is ambiguous." *Id.* at 21-22.

Justice Scalia concurred in the judgment, but disagreed with the majority that the Department of Labor's opinion letter was not entitled to *Chevron* deference, stating that an agency's position warrants *Chevron* deference if it represents the authoritative view of the agency. *Id.* at 26. Justice Breyer's dissent seems to harmonize the apparent difference between the "respect" discussed in *Skidmore* and the "deference" referred to in *Chevron*:

> *Skidmore* made clear that courts may pay particular attention to the views of an expert agency where they represent 'specialized experience,' even if they do not constitute an exercise of delegated lawmaking authority. . . . As Justice Jackson wrote for the Court, those views may possess the 'power to persuade' even where they lack the 'power to control.' *Chevron* made no relevant change. It simply focused upon an additional, separate legal reason for deferring to certain agency determinations, namely, that Congress had delegated to the agency the legal authority to make those determinations.

*Id.* at 35-36 (citations omitted).

While the reach of *Christensen* remains to be delineated, the Court can rely on the majority's

reconfirmation that persuasive agency interpretations are entitled to the "respect" articulated in *Skidmore*.[6]

As the Supreme Court stated over 35 years ago, "[w]hen faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. . . . When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order." *Udall v. Tallman*, 380 U.S. 1, 16 (1965). Moreover, the Court will uphold the agency's reasonable interpretation of its own ambiguous regulation, as per the Supreme Court's holding in *Auer*, 519 U.S. at 461. Indeed, as the Federal Circuit has stated, "[o]ur duty is not to weigh the wisdom of, or to resolve any struggle between, competing views of the public interest, but rather to respect legitimate policy choices made by the agency in interpreting and applying the statute." *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 966 F. 2d 660, 665 (Fed. Cir. 1992).

The regulation at issue is entirely silent regarding the valuation of an entire factor of production based on the value of less than one hundred percent of the input imported from a market economy. Therefore, this Court's task is to assess the reasonableness of Commerce's interpretation to allow for valuation based on the actual value of the inputs imported from a market economy, and to uphold a reasonable interpretation.

---

[6]The Supreme Court has recently granted *certiorari* in *Mead Corp. v. United States,* 185 F. 3d 1304 (Fed. Cir. 1999)*, cert granted,* 68 U.S.L.W. 3566 (U.S. May 30, 2000) (No. 99-1434), a case in which the Court of Appeals for the Federal Circuit declined to extend *Chevron* deference to a classification ruling by the Customs Service. Presumably the resulting opinion will give further guidance on this issue.

*B. The use of actual import prices to value a factor of production in a NME is reasonable.*

A reasonable interpretation of a statute or regulation is one that furthers the underlying purpose of that statute or regulation. In *United States v. Vogel Fertilizer Co.,* 455 US 16, 26 (1982) the Supreme Court noted that a "[r]egulation is not a reasonable statutory interpretation unless it harmonizes with the statute's 'origin and purpose.'" (quoting *National Muffler Dealers Ass'n, Inc. v. United States*, 440 U.S. 472, 477 (1979)). "The purpose of the Act [19 U.S.C. §1677b(c)(1)(B)] is to prevent dumping, an activity defined in terms of the marketplace. The Act sets forth procedures in an effort to determine margins 'as accurately as possible.'" *Lasko Metal Products, Inc. v. United States,* 43 F. 3d 1442, 1446 (Fed. Cir. 1994) (quoting *Rhone Poulenc, Inc. v. United States*, 899 F. 2d 1185, 1191 (Fed. Cir. 1990)). Moreover, "[t]he Act simply does not say–anywhere–that the factors of production must be ascertained in a single fashion." *Id.*

The statute provides for the most accurate determination of margins by requiring an ITA determination to be based on the "best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority." 19 U.S.C. § 1677b(c)(1). In NME factors of production cases, Commerce has generally used surrogate data to determine the dumping margin. Indeed, "this court has repeatedly upheld the use of surrogate data to value certain factors of production when it amounts to the best available information." *Olympia II*, 22 CIT at —, 7. F. Supp.2d at 1001 n.2. (citing *Tehnoimportexport, UCF America, Inc. v. United States*, 16 CIT 13, 16, 783 F. Supp. 1401, 1405 (1992)). Surrogate values may provide the best information available, even though, as this court has previously recognized, "the surrogate values used by Commerce in NME FOP cases are fictional." *Id*. at 1001.

In this case, Commerce used actual import data, instead of surrogate data, to value a factor of production. Actual import data may be the best available information to accurately value a factor of

production in a NME, and therefore this method of valuation arguably may provide more accurate information than the use of fictional surrogate data. Indeed, as this court has previously stated,

> Commerce's task in a nonmarket economy investigation is to calculate what a producer's costs or prices would be if such prices or costs were determined by market forces. As Commerce incisively stated in *Oscillating Fans and Ceiling Fans from the People's Republic of China*, 56 Fed. Reg. 55271, 55275 (Dep't Commerce 1991) (final determination): "[r]equiring the use of surrogate values in a situation where actual market-based prices incurred by a particular firm are available would be contrary to the statutory purpose."

*Tianjin Machinery Import & Export Corp. v. United States*, 16 CIT 931, 940, 806 F. Supp. 1008, 1018 (1992). Standing alone, the use of the market price actually paid for valuing a factor of production is reasonable because it brings market price into the comparison. *See Lasko*, 43 F. 3d at 317 ("Only if the combination of surrogate values and market-based values would somehow produce less accurate results would Commerce's use of this information be unreasonable."). Therefore, using surrogate value is not the only way to value a factor of production. However, the Court must still address whether Commerce's use of 35 percent of the steel inputs to value the cost of all the steel inputs used to produce the imported HSWs is supported by substantial evidence on the record in this case.

*C. Commerce's explanation of how its use of the market price of 35 percent of the steel inputs to value the cost of the entire factor of production for steel wire rod is supported by substantial evidence.*

In *Shakeproof I*, the Court ordered Commerce to "explain, with reference to the record, how its use of import prices in this case has led to the calculation of a more accurate dumping margin than any of the alternatives available to it." *Shakeproof I,* 23 CIT at —, 59 F. Supp.2d at 1357. Commerce sufficiently followed the Court's mandate in this regard.

Asserting that its valuation of domestic steel wire is consistent with NME methodology, Commerce states:

> The purpose of the factors of production methodology is to determine what NV would be if the producer's costs were set by the market forces in a comparable economy. Because the import is an actual market price paid by the NME producer it provides a more accurate value than other potential surrogates. Therefore, the actual price paid for the imports constitutes the best available information for valuing this factor.

*Id.* at 3.

Commerce then proceeds to explain its use of the term "meaningful." *Id.* at 4-5.[7] The definition of "meaningful" changes on a case-by-case basis, and Commerce finds a quantity of imports to be meaningful "if we can reasonably conclude from the quantities sold, and other aspects of the transactions, that the price paid is a reliable market economy value for the input." *Id.* at 5. Commerce points to evidence on the record showing that ZWG purchased more than one-third of the wire rod it used in the production of the merchandise from a market economy, and that the total imported amount of steel wire rod exceeded any amount purchased from any one of the seven domestic suppliers. *Id.* at 5-6.

Shakeproof asserts that the Remand Determination does not comply with the Court's directive to demonstrate that the use of import prices to value domestically purchased materials promotes accuracy. *Pl.'s Comments* at 6. Plaintiff contends that in justifying its use of import prices to value domestically purchased materials, Commerce *sub silentio* applied a recently adopted regulation, 19 C.F.R. § 351.408(c)(1)(1999) as a codification of prior practice.[8] *Pl.'s Comments* at 4. "Commerce's premature application of the alternative surrogate methodology set forth in Section 351.408(c)(1) to this case violates

---

[7]As the Remand Determination notes, "In making this decision, the Department has taken into account the concern expressed by the Court that describing 'meaningful' as 'not insignificant' was no definition at all." *Id.* at 4 (quoting *Shakeproof I*, 23 CIT at —, 59 F. Supp.2d at 1358).

[8]Plaintiff asserts that although Commerce did not directly state that it was applying §351.408(c)(1), "the absence of any detailed factual analysis of how accuracy is promoted in Commerce's Remand Determination now indicates beyond dispute that its decision to use ZWG's steel import prices as an alternative surrogate value is based solely on the methodology set forth in Section 351.408(c)(1)." *Pl.'s Comments* at 5.

its own rule regarding effective dates and the Administrative Procedure Act's rulemaking requirements, and is void." *Id.* at 5-6. It is true that the new regulation codifies the practice of using the value for an imported input to value all domestically-sourced inputs as well. It is also true that as regards statutes, "a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208 (1988) (citing *Brimstone R. Co. v. United States*, 276 U.S. 104, 122 (1928)). The general rule disfavoring retroactivity applies as well to administrative regulations. *See Rhone Poulenc, Inc. v. United States*, 14 CIT 364, 365, 738 F. Supp. 541, 543 (1990) ("[A]n administrative regulation will not be construed to have retroactive effect unless the language requires such a result.").

> The relevant portion of the prior regulation contains the following language:

> (c) Use of factors of production. If such or similar merchandise is not produced in a non-state-controlled-economy country which the Secretary concludes to be comparable in terms of economic development to the home market country, the Secretary may calculate the foreign market value using constructed value based on factors of production incurred in the home market country in producing the merchandise, including, but not limited to, hours of labor required, quantities of raw materials employed, and amounts of energy consumed, if the Secretary obtains and verifies such information from the producer of the merchandise in the home market country.

19 C.F.R. § 353.52(c). Commerce's actions in this case do not conflict with the regulatory language. Commerce used the actual price paid for one-third of the imported steel wire rod to value the entire production of steel wire rod. Although using the actual price to value a factor of production in this manner is not expressly permitted by the prior regulation, neither is it prohibited by the regulation's language. In the Court's view, Commerce has not acted beyond its regulatory authority.

> Once again, the Court notes that using surrogate value is not the only way to value a factor of production. As the *Tianjin* court noted, "[n]othing in the Tariff Act of 1930 . . . or its legislative history

mandates that Commerce must derive foreign market values exclusively from either actual prices paid by

the nonmarket economy, or from surrogate based values." 16 CIT at 940, 806 F. Supp. at 1018. As such,

"Commerce may use evidence of prices paid by the nonmarket economy country to market-economy

suppliers in combination with surrogate country information when valuing factors of production." *Id.*, 16 CIT

at 941, 806 F. Supp. at 1018. The ITA could have taken the action it did even under the former regulatory

scheme, and has sufficiently explained its reasons for changing its valuation methodology.[9]   Commerce

explains that its valuation methodology is in accordance with the prior regulation.

> Although Shakeproof is correct that the contested valuation methodology
> for steel wire rod was never used in any prior HSLW segment, the claim
> is misleading. Though this valuation methodology has never been used in
> any prior HSLW segment, ZWG has never used a significant amount of
> steel wire rod imported from a market economy country as an input
> before this period of review (POR).

*Remand Determination* at 10, Cmt. 1.

Shakeproof claims that Commerce is bound to follow the precedent set forth in *Olympia II*, which

dealt with the reliability of the PRC trading company data for valuing steel inputs used to produce heavy

forged hand tools. *Pl.'s Comments* at 9. Plaintiff is again incorrect. That case carved out an exception

to the rule that "[t]he cost of raw materials from a market economy supplier, paid in convertible currencies,

provides Commerce with the closest approximation of the cost of producing the goods in a market

economy," and is therefore the best information available in a factors of production analysis. *Lasko Metal*

---

[9]Commerce disputes the assertion that it applied 19 C.F.R. §351.408(c)(1) to this case, claiming that its reference to §351.408(c)(1) was cited in the remand results "only as a restatement of the agency's interpretation of the Uruguay Round Agreements Act." *Def.'s Comments* at 5. The only mentions of 19 C.F.R. §351 are in reference to the recodification of 19 C.F.R. §353.18(c), and to emphasize Commerce's point that there was not during the POR nor is there currently a requirement in the statute or regulations that Commerce verify actual market economy import prices used to value an input. *See* Remand Determination at 5, 17.

*Products, Inc. v. United States*, 16 CIT 1079, 1081, 810 F. Supp. 314, 317 (1992), *aff'd*, 43 F.3d 1442

(Fed. Cir. 1994). *Olympia II* provided that Commerce would not have to use actual import data to value

a factor of production if the agency could make a case that it was not the actual import data, but surrogate

data, that would provide the best available information in determining a factor of production. *See Olympia*

*II*, 22 CIT at —, 7 F. Supp. 2d at 1002.[10]  "The criteria Commerce employed to assess the reliability of

the import prices in the *Olympia* Remand were, *inter alia*: (1) the value and volume of steel imports, (2)

the type and quality of the imported steel, and (3) consumption of imported steel by the NME producers."

*Pl.'s Comments at 12,* (quoting *Olympia Industrial, Inc. v. United States,* No. 99-18, slip op. At 6 (CIT

Feb 17, 1999) ("*Olympia III*")).  Plaintiff argues that these criteria should have been used in this case to

evaluate the reliability of ZWG's import prices. *Id.*

The Court agrees with Defendant that Commerce is not bound by the *Olympia* criteria, but has

correctly adhered to the *Lasko* tenet that "it is Commerce's duty to determine margins as accurately as

possible, and to use the best information available to it in doing so." *Lasko*, 43 F. 3d at 1443.  As

Defendant states, a critical difference exists between the facts of *Olympia* and the facts of this case. *See*

*Def.'s Comments* at 6.  "[T]he PRC producer in the instant case, purchased its steel wire rod from a

market economy supplier through a market economy trading house paying in convertible, hard currency.

By way of contrast, Olympia, a PRC producer, purchased its steel from a PRC trading house, paying for

the goods in Chinese currency." *Remand Determination* at 15, Cmt. 3.  The Court cannot agree with

---

[10]In *Olympia II*, this court refused to uphold Commerce's redetermination results because "Commerce fails to offer a reason why relying on this market-based data somehow produces less accurate results than using other surrogate date." 22 CIT at —, 7 F. Supp. 2d at 1002 (citing *Lasko*, 16 CIT at 1081, F. Supp. at 317.).  In *Olympia III*, this court finally sustained the redetermination upon reviewing Commerce's explanation that "after examining the pricing data. . . the prices paid by the trading company were aberrationally low, even though purchased from a market-economy source and paid for in convertible currencies." *Olympia III,* No. 99-18, slip op. at 8.

Plaintiff that Commerce concedes that it is comparing two potential surrogates, rather than evaluating actual market prices as opposed to surrogate data. *Pl.'s Comments* at 13. Here, the PRC producer purchased its steel wire rod from a market economy supplier through a market economy trading house and paid in market economy currency; Commerce is, therefore, not bound by *Olympia* and need not apply the *Olympia* criteria to determine if its valuation system is reliable.

Plaintiff also contends that Commerce's explanation that the steel wire rod imported from the United Kingdom constitutes more than one-third of the wire rod used in the production of the washers is insufficient. *Pl.'s Comments* at 7. "[W]ith the exception of a perfunctory review of the quantity of steel wire rod purchased from the United Kingdom compared with the quantities purchased from seven domestic suppliers," Commerce made no attempt to explain, with reference to the record, its use of import prices to value the entire factor of production. *Id.* at 3. Plaintiff further asserts that in conjunction with supplying "only [one] additional factual embellishment, compared to the Final Determination remanded by the Court," Commerce has not explained how accuracy is promoted by its methodology. *Id.* at 7. Accordingly, Plaintiff contends, "substantial evidence on the record does not support Commerce's determination, and the methodology employed by Commerce is unreasonable." *Id.* at 9.

The Court finds this argument unconvincing. As stated in *Shakeproof I*, "[w]hile Congress has left it within Commerce's discretion to develop methodologies to enforce the antidumping statute, any given methodology must always seek to effectuate the statutory purpose–calculating accurate dumping margins." *Shakeproof I,* 23 CIT at —, 59 F. Supp.2d at 1358. The Court also made clear in *Shakeproof I* that "the use of import prices to value domestically purchased material will not promote accuracy, fairness or predictability unless Commerce explains its finding of significance." *Id.* Commerce did explain its finding of significance, with sufficient albeit minimal reference to the record. It is reasonable to assume that accuracy

is promoted when the price paid for the largest single purchase of a certain input is used to value all of that input. Thus, Commerce complied with the Court's order to show how its use of import prices promotes accuracy; its methodology is supported by substantial evidence and is otherwise in accordance with law.

*D. Commerce properly explained why good cause does not exist to verify the import price information for steel wire rod.*

In *Shakeproof I,* the Court directed Commerce to reconsider its use of unverified import prices and explain why good cause does not exist to verify the prices that ZWG submitted. *Id.* at 1359. The applicable regulation directs the Secretary of Commerce as follows:

> (a) *In general.* (1) the Secretary will verify all factual information the Secretary relies on in:
> | | |
> |---|---|
> | (i) | A final determination under § 353.18(i) or § 353.20; |
> | (ii) | The final results of an expedited review under § 353.22(g); |
> | (iii) | A revocation under § 353.25; |
> | (iv) | The final results of an administrative review under § 353.22(c) or (f) if the Secretary decides that good cause for verification exists; and |
> | (v) | The final results of an administrative review under § 353.22(c) if: |
>
> > (A) An interested party, as defined in paragraph (k)(3), (k)(4), (k)(5), or (k)(6) of §353.2, not later than 120 days after the date of publication of the notice of initiation of review, submits a written request for verification; and
> >
> > (B) The Secretary conducted no verification under this paragraph during either of the two immediately preceding administrative reviews.

19 C.F.R. § 353.36(a) (1996). The Court of Appeals for the Federal Circuit addressed the issue of when verification is required based upon the "good cause" standard in *Torrington Co. v. United States*, 68 F.3d 1347, 1350 (Fed. Cir. 1995). In that case, the court rejected appellant's argument that the standard is an objective one and, using the *Chevron* analysis, stated:

> The Commerce Department's determination that the Secretary retains substantial discretion in deciding when "good cause" for verification is shown is a permissible interpretation of section 1677e(b)(3)(B), particularly in light of the general principle that agencies with statutory enforcement responsibilities enjoy broad discretion in allocating investigative and enforcement resources.

*Id.* at 1351 (citing *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)). Regardless of whether the Chevron

analysis applies, investigating authority vested in an agency includes the discretion to decide what methods to use. *See Coalition for the Preservation of Am. Brake Drum and Rotor Aftermarket Manufs. v. United States*, 23 CIT —, —, 44 F. Supp. 2d 229, 258 (1999) ( "Since the statute does not specify what constitutes best available information, these decisions are within Commerce's discretion.").

In this case, a verification did occur during the first administrative review; therefore, Plaintiff was prevented from requesting verification in the normal course. *Shakeproof I*, 23 CIT at —, 59 F. Supp. 2d at 1359. In order to be successful, Plaintiff would have to have shown that good cause existed for verification to occur again in the third review. *See* 19 U.S.C. §1677 m(1).[11] Plaintiff argues that such a request in this case would have been futile and that it had no reason to request verification since it did not know that Commerce might use actual import prices to value the steel inputs. Plaintiff disagrees with Commerce that there was no good cause, citing price discrepancies and the general proposition that good cause for verification exists whenever import prices are used to value non-imported materials.

In its Remand Determination, Commerce explains that the discrepancies cited by Plaintiff were

---

[11]19 U.S.C. §1677m(i) provides:

The administering authority shall verify all information relied upon in making

(1) a final determination in an investigation
(2) a revocation under section 1675(d) of this title, and
(3) a final determination in a review under section 1675 (a) of this title, if- -

    (A)    verification is timely requested by an interested party as defined in section 1677 (9)(C), (D), (E), (F), or (G) of this title, and

    (B)    no verification was made under this subparagraph during the 2 immediately preceding reviews and determinations under section 1675(a) of this title of the same order, finding, or notice, except that this clause shall not apply if good cause for verification is shown.

corrected in a further submission by ZWG. *Remand Determination* at 8.  In addition, Commerce argues

that it is not required to verify actual market economy import prices and that Plaintiff did not and does not

object to that price being used to value the imported steel itself.  Furthermore, Commerce suggests that

Plaintiff should have requested "good cause" verification during the administrative review if it thought the

price was not credible.  *Id.* at 17, Cmt. 4.  In support of this assertion, Commerce cites to several instances

wherein the Department conducted verifications when an interested party requested and could demonstrate

that good cause existed, even though a verification was already conducted within the two immediately

preceding reviews.[12]  *Id.* at 8.

---

[12]*See Silicon Metal From Brazil; Final Results of Antidumping Duty Administrative Review*, 59 Fed. Reg. 42806, 42813 (Aug. 19, 1994) (permitting verification in a less-than-fair-value investigation even though a verification was conducted in the preceding administrative review); *Notice of Preliminary Results of Antidumping Duty Administrative Review: Certain Welded Carbon Steel Pipe and Tube From Turkey*, 61 Fed. Reg. 35188, 35192 (July 5, 1996) (allowing verification where petitioners demonstrated good cause and the results from the preceding verification had not yet been received).

Commerce's explanations in its remand on this point satisfy the Court's directive to explain why good cause did not exist to verify the actual prices for imported steel. Because Commerce's explanations are reasonable and the decision whether to verify is within its discretion, the Court affirms this portion of Commerce's remand determination.

## IV.  CONCLUSION

For the foregoing reasons, the Court affirms the Remand Determination. An order so stating will be entered accordingly.

Dated: _____                              _____
        New York, NY                                        Judith M. Barzilay
                                                            Judge