**Slip Op. 02-68**

# UNITED STATES COURT OF INTERNATIONAL TRADE
_____

| | |
|---|---|
| _____ | : |
| | : |
| PRODOTTI ALIMENTARI | : |
| MERIDIONALI, S.R.L., | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Court No. 01-00020 |
| | : **Public Version** |
| UNITED STATES, | : |
| | : |
| Defendant, | : |
| | : |
| _____ | : |

[ITA's antidumping duty determination remanded.]

Dated: July 16, 2002

<u>Riggle and Craven</u> (<u>David J. Craven</u>) for plaintiff.

<u>Robert D. McCallum, Jr.</u>, Assistant Attorney General, <u>David M. Cohen</u>, Director, <u>Velta A. Melnbrencis</u>, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (<u>Matthew P. Reed</u>), <u>Michelle D. Lynch</u>, Office of Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

## **OPINION**

**RESTANI, Judge:**

This matter is before the court on Plaintiff's motion for judgment on the agency record pursuant to USCIT Rule 56.2. Plaintiff Prodotti Alimentari Meridionali, S.r.l. ("Prodotti"), a respondent in the antidumping review, challenges certain affirmative determinations made by the

Department of Commerce ("Department" or "Commerce") upon a sunset review. See Certain

Pasta from Italy: Final Results of Antidumping Administrative Review, 65 Fed. Reg. 77,852

(Dep't Comm. 2000) ("Final Results"). Prodotti primarily challenges Commerce's constructed

value methodology arguing that the level of trade adjustment and cost of production analyses

were flawed. In addition, Prodotti challenges Commerce's decision to conduct verification.

Prodotti also claims that Commerce did not timely release its calculations and that the

calculations released were incomplete

## JURISDICTION & STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994). The court will uphold

Commerce's determinations in antidumping investigations unless they are "unsupported by

substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. §

1516a(b)(1)(B)(i).

## BACKGROUND

On May 12, 1995, three U.S. pasta producers ("petitioners")[1] filed a petition with

Commerce alleging that imports of certain pasta from Italy were being, or were likely to be, sold

in the United States at less than fair value (LTFV). See Initiation of Antidumping Duty

Investigations: Certain Pasta From Italy and Turkey, 60 Fed. Reg. 30268-01 (Dep't Comm.

1995). Commerce investigated and, on June 3, 1996, issued a final affirmative determination.

See Notice of Final Determination of Sales at Less Than Fair Value: Certain Pasta From Italy, 61

Fed. Reg. 30326-01 (Dep't Comm. 1996). On July 24, 1996, Commerce published the

corresponding antidumping duty order. See Notice of Antidumping Duty Order and Amended

---

[1] The petitioners were Borden, Inc., Hershey Foods Corp., and Gooch Foods, Inc.

<u>Final Determination of Sales at Less Than Fair Value: Certain Pasta From Italy</u>, 61 Fed. Reg.

38547 (Dep't Comm. 1996).

On July 15, 1999, Commerce published notice of the "Opportunity to Request an

Administrative Review" of the initial antidumping order.  <u>See</u> <u>Antidumping or Countervailing</u>

<u>Duty Orders, Finding, or Suspended Investigation,</u> 64 Fed. Reg. 38181 (Dep't Comm. 1999).   In

accordance with 19 C.F.R. § 351.213(b)(2), several producers and/or exporters of pasta from

Italy requested an administrative review of their sales, including Prodotti.  On August 30, 1999,

Commerce initiated the sunset review at issue here.  <u>See</u> <u>Initiation of Antidumping and</u>

<u>Countervailing Duty Administrative Reviews and Requests for Revocation in Part</u>, 64 Fed. Reg.

47167 (Dep't Comm. 1999).  The period of review ("POR") was July 1, 1998, through June 30,

1999, and the imports covered by the review include non-egg dry pasta in packages of five

pounds or less.  <u>See</u> <u>id.</u>

Commerce issued questionnaires to all subject importers on August 30, 1999.[2]   Prodotti

submitted responses to all sections except Section D, the section regarding its Cost of Production

("COP"), by October 29, 1999.  <u>See</u> <u>Notice of Preliminary Results and Partial Recission of</u>

<u>Antidumping Duty Administrative Review and Intent To Revoke Antidumping Duty Order in</u>

<u>Part:Certain Pasta From Italy</u>, 65 Fed. Reg. 48467, 48468 (Dep't Comm. 2000).  On November

12, 1999, petitioners alleged that Prodotti made sales below the COP during the POR.  Pursuant

to 19 U.S.C. § 1677b(b)(2)(A)(ii), Commerce initiated its below-COP investigation.  Prodotti did

not submit its initial Section D response until January 3, 2000.  <u>Preliminary Results</u>, 64 Fed. Reg

_____

[2]  Section A of the questionnaire sought general information relating to a party's
corporate structure, and sales of the subject merchandise.  Section B and C of the questionnaire
required comparison listings of home market and U.S. market sales.  Section D related
specifically to COP and constructed value of the subject merchandise.

at 48468. Prodotti's final response to the COP section of the questionnaire was not submitted until April of 2000.[3]

On or about December 8, 1999, Petitioners requested that Commerce conduct verification of any exporter which had not been subject to verification in the previous two reviews.[4] On or about January 5, 2000, Commerce notified Prodotti that it intended to conduct verification. Prodotti objected on January 6, 2000. Id. Commerce subsequently issued a memorandum listing the respondents, including Prodotti, selected for sales verification. On May 3, 2000, Commerce issued verification procedures for Prodotti. Verification of Prodotti's sales data was conducted from May 15, 2000 to May 19, 2000.

On July 31, 2000, Commerce notified Prodotti of its affirmative finding in the Preliminary Results and transmitted a copy of the preliminary analysis memorandum to Prodotti, including Commerce's calculation methodology and a copy of the computer program used to calculate the antidumping margin. On August 8, 2000, Commerce published its preliminary affirmative antidumping duty determination. See Preliminary Results, 65 Fed. Reg. at 48468. On August 9, 2000, Prodotti requested Commerce's analysis methodology and calculations as well as computer printouts. Commerce responded by letter stating that it already provided the

---

[3] Between January 21 and April 18, 2000, there were several communications between Commerce and Prodotti discussing the questions in Section D and Prodotti's responses. On January 21, 2000, Commerce requested clarification of Prodotti's section D response. On February 3, 2000, Prodotti requested clarification of section D. On February 9, 2000, the parties held a teleconference to discuss revision of Prodotti's Section D response. On February 24, 2000, Prodotti submitted its supplemental response to Section D. On April 3, 2000, Commerce requested clarification of the response. On April 18, 2000, Prodotti submitted its second supplemental response to Section D.

[4] Prodotti objected to petitioner's request arguing that the request was untimely and did not set forth the identities of parties for whom such verification was requested.

sufficient data but, as a "courtesy," provided additional printouts.

On December 13, 2000, Commerce published its Final Results. On appeal, Prodotti challenges numerous aspects of the Final Results.

## DISCUSSION

### A.  Burden of Proof

The majority of Prodotti's claims challenge the methodology underlying specific determinations without alleging that any flaws adversely affected Plaintiff. In the context of a challenge to an affirmative antidumping determination, it usually is apparent when plaintiffs would be adversely affected by agency error, but in some cases the purpose of the challenge is unclear and the plaintiff/respondent must present a viable claim that the alleged errors in the agency's methodology likely resulted in a higher antidumping margin.

In other contexts, in unfair trade and customs matters, plaintiffs have been required to make a prima facie showing that they were likely prejudiced by agency error. See, e.g., Belton Indus., Inc. v. United States, 6 F.3d 756, 761 (Fed. Cir. 1993) (requiring showing of prejudice from Commerce's non-compliance with countervailing duty notice provision); Cummins Engine Co., 83 F.Supp.2d 1366, 1378 (Ct. Int'l Trade 1999) (no showing of prejudice due to procedural error as to NAFTA origin verification). While plaintiffs in antidumping duty cases cannot be required to reconstruct all of the agency's calculations, where prejudice is an issue, a plaintiff, at minimum, must explain how it likely would benefit from a particular claimed revision. To allow otherwise would cause undue delay in the enforcement of agency determinations by encouraging plaintiffs to assert broad claims challenging any and all determinations, regardless of whether the alleged error actually affected the margin at issue.

**B. Currency Conversion**

Prodotti first argues that the Final Results are flawed because Commerce conducted unnecessary currency conversions in constructing the U.S. price of Prodotti's product. To calculate the dumping margin, Commerce calculates the difference between the Normal Value ("NV") of the product and its export price ("EP") or constructed export price. 19 U.S.C. § 1675(a)(i). To make a fair comparison, 19 U.S.C. §1677b-1 requires that the prices and costs of products under review be converted to U.S. dollars.[5]

Prodotti records all transactions in lira. In its Preliminary Determination, Commerce presumed that, because all of the transactions were recorded in lira, Prodotti had transacted all sales in lira. Commerce, therefore, converted all sales to dollars pursuant to §1677b-1. Commerce was later notified by Prodotti that a small number of sales were originally transacted in dollars but converted to and recorded in lira by Prodotti for internal accounting purposes. Once Commerce identified those limited sales originally made in dollars, Commerce reversed its conversions back to lira – that is, back to Prodotti's original figures. Commerce then converted the lira to dollars using the same exchange rate originally applied by Prodotti. See Issues and Decision Memorandum at Comment 4. Prodotti argues that this multiple conversion was unnecessary.[6]

The court concludes that Commerce's unique methodology merely corrected an

---

[5] Commerce Regulation 19 C.F.R. §351.415 tracks this statute and has the same requirements.

[6] The computer program used by Commerce confirms that the agency converted those sales originally transacted in dollars three times: (1) from lira (as recorded in Prodotti's records) to U.S. dollars; (2) from U.S. dollars back to lira (returning to Prodotti's original figures); (3) from lira to U.S. dollars (using the exchange rate provided by Prodotti, presumably what it had originally used to record the dollar sales as lira sales).

unintentional excess conversion that would not have occurred but for Prodotti's confusing submission. Moreover, Prodotti has not shown how it was prejudiced by the correction. Because the parties agree that Commerce reconverted sales data using the same exchange rate as Prodotti, the court fails to see how the resulting margin was adversely affected. In fact, Prodotti does not even assert that it was incorrect. The court finds no meaningful error in Commerce's currency conversion.

### C. Level of Trade Analysis

Section 773(a)(1)(B) of the Tariff Act requires that Commerce establish NV based on home market sales at the same level of trade ("LOT") as the constructed export price or export price. See 19 U.S.C. 1677b(a)(1)(B)(i); see also Statement of Administrative Action § B.2.c.(4) , accompanying H.R.Rep. No. 103-826(I), at 892, reprinted in 1994 U.S.C.C.A.N. 4040, 4215 ("SAA"). 19 C.F.R. § 351.412(c)(2) states that Commerce "will determine that sales are made at different levels of trade if they are made at different marketing stages (or their equivalent)." When sales in the U.S. and respondent's home market cannot be compared at the same LOT, an adjustment to NV may be appropriate. SAA § B.2.c.(4) ¶ 3. The statute provides for a LOT adjustment if the difference in level of trade involves the performance of different selling activities. 19 U.S.C. § 1677b(a)(7)(A).

Prodotti reported ten customer categories in its home market as the basis for identifying sales at different levels in the chain of distribution. Rather than adopt Prodotti's grouping, Commerce developed a methodology to analyze the various selling functions of a particular seller by "assigning a ranking factor (i.e. high, medium, low) to a selling function (i.e. freight and delivery, or warehousing) solely based upon the number of observations for which a direct expense associated with the selling function actually occurred." See Issues and Decision Memo,

Comment 5A.  The resulting value was used to categorize different levels of trade.[7]  Commerce's

LOT methodology was based on the premise that different LOTs are characterized by purchasers

and sellers at different places in the channel of distribution and performing qualitatively or

quantitatively different functions.  See Issues and Decision Memo, Comment 5A.

Prodotti argues that this analysis is distortive because it ignores qualitative differences in

the various selling functions.  According to Prodotti, different selling functions were erroneously

presumed to have equal value regardless of actual expense or value  (i.e. a service that provides

minimal value is given the same weight as a service that provides substantial value).[8]  This

presumption becomes problematic when the seller is categorized solely based on the number of

observations.  For example, if two sellers employ the same channel of distribution (e.g. broker at

a substantial cost) but one employs a second (e.g. local freight transportation at a minimal cost),

the seller utilizing the single function is assigned a significantly lower overall value even though

the second seller's expenses were only slightly more than the first.  At oral argument, Commerce

conceded that this quantitative analysis could result in significantly different values for almost

---

[7] Based upon its analysis of the selling functions associated with Prodotti's customer categories, Commerce developed the following groupings:

Group 1 -      (1) distributors
               (4) hypermarkets
Group 2 -      (2) stores
               (3) wholesalers
               (5) restaurants
               (7) peddlers
               (9) private clubs/others
Group 3 -      [     ] other pasta manufacturers

[8] Prodotti points to Commerce's analysis of "Freight and Delivery" function where Commerce gave more weight to a function that cost [     ] lira than to a function that cost over [     ] lira.

identical sellers, but explained that this particular analysis did not determine the final LOT, rather

a more general qualitative approach was used.

While the court questions the usefulness of this quantitative analysis for any purpose,

Prodotti has not explained how the analysis adversely affected the margin other than to state that

the analysis was "distorted." In the absence of any alleged prejudice, the court declines to

remand on this issue.

**D.  Cost of Production**

**1. Period of Review**

To calculate the dumping margin, Commerce compares NV, the price of Prodotti's

product in its home market, Italy, to EP, the price of Prodotti's product in the U.S.[9] See 19

U.S.C. § 1677b (a).  In determining NV, Commerce may disregard home market sales ("HM")

below the cost of production ("COP"),[10] if (1) these sales have been made over an extended

period of time in substantial quantities; and (2) not at prices which would permit recovery of all

costs withing a reasonable period of time.  See 19 U.S.C. §§ 1677b (b) (1) (A) and (B).  With

---

[9]  19 U.S.C. § 1677a (a) provides that the EP is the "price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter outside of the U.S. to an unaffiliated purchaser . . ."

[10]  19 U.S.C. § 1677b (b) (3) reads:

the cost of production shall be an amount equal to the sum of--
    (A) the cost of materials and of fabrication or other processing of any kind employed in
    producing the foreign like product, during a period which would ordinarily permit the
    production of that foreign like product in the ordinary course of business;
    (B) an amount for selling, general, and administrative expenses based on actual data
    pertaining to production and sales of the foreign like product by the exporter in question; and
    (C) the cost of all containers and coverings of whatever nature, and all other expenses
    incidental to placing the foreign like product in condition packed ready for shipment.

respect to the first prong, the statute states that an "extended period" of time means "a period that is <u>normally</u> 1 year, but not less than 6 months." 19 U.S.C. § 1677b (b) (2) (B) (emphasis added); <u>see</u> <u>also</u> SAA § B.3.  Prodotti argues that Commerce's methodology is flawed because: (1) Commerce erroneously employed a seventeen month POR;  (2) Commerce failed to make appropriate allowances for price fluctuations of wheat semolina; and (3) Commerce failed to match the POR for HM total sales and the POR for sales below COP.

Prodotti primarily argues that 19 U.S.C. §1677b (b) (2) (B) does not provide for a POR in excess of one year and, therefore, Commerce's seventeen month POR was not in accordance with law.[11]  19 CFR § 351.406 (b) states that "the extended period of time... normally will coincide with the period in which the sales under consideration of the determination of normal value were made."  In addition to sales made during the POR, it is common and accepted practice for Commerce to consider sales within 90 days before and 60 days after the POR for comparison. See <u>AIMCOR v. U.S.</u>, 86 F.Supp.2d 1248, 1255 n 4 (Ct. Int'l Trade 1999) (quoting <u>Certain Circular Welded Carbon Steel Pipes and Tubes From Thailand; Final Results of Antidumping Duty Administrative Review</u>, 61 1,328, 1,332 (1996) ("The Department has implemented the contemporaneous 90/60 window in order to fulfill the statutory requirements in section 773(a)(1) of the Tariff Act that [fair market value] be based on the price of contemporaneous sales of such or similar merchandise.")).  Here, Commerce first defined the POR as one year and then included sales within this "90/60 day window of contemporaneity."  The resulting analysis of seventeen

---

[11] Following oral argument, Prodotti filed a motion for factual correction on the ground that the court mistakenly assumed that a seventeen month POR was "normal."  The court specifically addressed Prodotti's concerns at oral argument expressly noting that the seventeen month period included the window of contemporaneity.  Prodotti's motion was not to make a factual correction but merely was an attempt to reargue the legitimacy of the POR and therefore is stricken.

months of sales is neither prohibited by statute nor inconsistent with Commerce's normal practice.

Prodotti next argues that Commerce failed to make allowances for declines in wheat semolina prices. Commerce generally calculates a single weighted-average cost for the entire POR for respondents in non-high inflationary economies, unless this methodology results in inappropriate comparisons -- i.e. when there is a single-primary input product and that input experiences a significant and consistent decline or rise in its cost throughout the reporting period. See Thai Pineapple v. United States, 273 F.3d 1077, 1084 (Fed. Cir. 2001). Prodotti argues that Commerce did not properly adjust the annual weight-averaged direct material costs to adjust for the decline in wheat semolina prices.

Both parties agree that wheat semolina is a substantial portion of the total cost of manufacture ("TOTCOM"). In fact, Commerce considered wheat semolina a single-primary input product. Commerce determined that there was a consistent decline in wheat semolina prices for only six months and that the market prices decreased by only twelve percent or less. Issues and Decision Memo at Comment 8. Prodotti argues that prices declined somewhat more drastically.[12] Not surprisingly, both parties argue that the other's analysis is crafted to calculate the maximum or minimum decline. There is no bright line standard for determining a significant decline. A review of the data provided, however, suggests that the price of wheat semolina was not subject to a substantial decline but was, at best, subject to price fluctuations - decline and recovery. Prodotti's claim was largely based on the premise that wheat semolina prices are

_____

[12] Prodotti claims that the price of wheat semolina fluctuated as much as [      ].

seasonal,[13] which in itself suggests price fluctuation rather than substantial decline. The court finds that Prodotti failed to show that the price drastically declined so as to require Commerce to deviate from its normal methodology.

Prodotti last argues that the POR for COP does not match the POR for determining volume.[14] Prodotti argues that Commerce reviewed data within the window of contemporaneity for COP purposes but not for volume and, therefore, Commerce did not properly correlate the data. Commerce is not required to match the period for assessing the total volume of sales in the HM to the period of assessing COP. See Thai Pineapple, 273 F.3d at 1084 ("We do not read the statutory language as specifying the period to be used when determining costs ... the statute does not dictate the methodology for calculating costs of production...or for matching those costs against sales.").

## 2. Rounding and Other "Noise"

Prodotti argues that Commerce improperly excluded certain sales as below-COP due to impermissible rounding and truncating. Prodotti points to at least 1000 sales that were found to be below cost by less than 2/10 of a cent, and more than 300 that were below 4/100 of a cent. Prodotti argues that these barely below-COP sales should not have been rejected as below cost because the underselling was so inconsequential that it should be considered de minimis.

---

[13] Prodotti contends that Commerce's extended POR resulted in a double-counting of certain "in season" months (May through August), during which agricultural seasonal products like wheat semolina are sold at lower prices. The record does not reveal any evidence as to wheat growing cycles and the court declined Prodotti's invitation to take judicial notice of agricultural cycles in the Northern Hemisphere.

[14] The extended POR for "Sales Below Cost of Production" began May 1, 1998 and ended September 30, 1999 (July 1, 1998 to June 30, 1999 excluding the 60/90 day window of contemporaneity). See Issues and Decision Memorandum at 16.

Commerce maintains that 19 U.S.C. § 1677b (b) (1) establishes a bright-line test to determine whether sales are below cost. The statute does not contain a de minimis provision that prohibits Commerce from disregarding sales that are only slightly below cost. The statute does, however, contain a moderating provision. Under 19 U.S.C. § 1677b (b) (1) (B), Commerce may disregard below-COP sales only if they "were not at prices which permit recovery of all costs within a reasonable period of time." Despite that provision, Prodotti did not argue or submit data showing that the barely below-COP sales were offset by sufficiently above cost sales so that costs are recovered over time. Absent such a showing, the court can find no alternative statutory or regulatory basis to require inclusion of the contested sales.

Prodotti also argues that Commerce extended certain two-digit data into four-digit data, and later truncated the data thereby distorting the data. Commerce rejects Prodotti's claim that it truncated data as factually wrong. Commerce is bound by neither statute nor regulation in its methodology regarding rounding, i.e. whether it rounds data to two, three or four decimals. Further, Prodotti has not adequately explained how it was prejudiced by any truncation. Prodotti's sole explanation is that the resulting "noise" distorted the analysis. The court declines to remand on this issue.

### E. Verification

#### 1. Commerce's Decision to Conduct Verification

Prodotti next argues that verification was inappropriate because Commerce did not show "good cause" sufficient to initiate verification. 19 U.S.C. §1677m(i)(3) provides Commerce with the authority to verify information submitted by respondents in a sunset review. §1677m(i)(3) requires Commerce to conduct verification if timely requested by an interested party and if good cause for verification is shown. Timken Co. v. United States, 18 CIT 486, 495-96. (1994) (citing

Torrington Co. v. United States, 17 CIT 951, 955, 832 F.Supp. 393, 397 (1993)).[15]  The statute

describes when Commerce must conduct verification.  The court does not read §1677m(i)(3) to

contain a limitation on Commerce's discretion to voluntarily and in good faith verify data.

Commerce is generally given wide latitude in verification procedures.  See Shakeproof Assembly

Components Division of Illinois Tool Works, Inc. v. United States, 102 F. Supp. 2d 486, 495 (Ct.

Int'l Trade 2000) ("[Commerce] enjoys broad discretion in allocating investigative and

enforcement resources.").  The court finds no statutory or regulatory basis to restrict Commerce's

ability to verify its own data.[16]  Even if a statutory or regulatory restriction existed, Commerce

has demonstrated good cause here.

In its Issues and Decision Memo, Commerce discusses at length why changes in

Prodotti's organizational structure and revisions to its questionnaire responses prompted

verification.  See Issues and Decision Memo at Comment 8.  Prodotti argues that there were no

organizational changes.  The record, however, reveals that Prodotti was operating a new pasta

factory owned by another company under review.   Prodotti also argues that it did not submit

numerous supplemental or revised questionnaires.  Prodotti does not dispute, however, that there

---

[15]  19 U.S.C. §1677m(i) reads in relevant part:

  The administering authority shall verify all information relied upon in making--
. . .

(3) a final determination in a review under section 1675(a) of this title, if--
(A) verification is timely requested by an interested party as defined in section 1677(9)(C), (D), (E), (F), or (G) of this title, and
(B) no verification was made under this subparagraph during the 2 immediately preceding reviews and determinations under section 1675(a) of this title of the same order, finding, or notice, except that this clause shall not apply if good cause for verification is shown.

[16]  19 C.F.R. § 351.307(b)(4) provides that verification may be refused, but facts available will be used in such instances.

were some supplemental responses and numerous discussions between Commerce and Prodotti

regarding clarification of the questionnaires and Prodotti's proposed revised responses.   Both

parties agree that, at minimum, there was considerable confusion surrounding Prodotti's

submissions.  It therefore was reasonable for Commerce to attempt verify the various responses.

Because verification was not only reasonable but likely necessary for consideration of the data,

the court finds that Commerce had good cause to conduct verification.

Consistent with 19 U.S.C. §1677m(i), Petitioners requested verification of "any exporter

that has not been subject to verification in the two immediately preceding reviews." Verification

Request at 1-2.  Prodotti claims that, because the request did not specifically identify Prodotti, it

was overly broad and, therefore, defective.  The court rejects Prodotti's technical argument.

First, there is no statutory requirement that petitioner identify individual respondents by name.

Second, there were only seven respondents in this review, therefore, Prodotti was reasonably

apprised that it was subject to verification.

### 2. Program Manager

Prodotti argues that Commerce improperly allowed the program manager to participate in

the verification process.  Because verification is an investigative tool, Commerce is given wide

latitude in verification procedures.  See Micron Tech, Inc., v. United States, 117 F.3d 1386, 1396

(Fed.Cir. 1997).  There is a presumption that Commerce will act in good faith.  See N.E.C. Corp.

v. United States, 958 F.Supp. 624, 631-32 (Ct. Int'l Trade 1997).  Commerce maintains that it

has the discretion to allow the program manager to participate and that it is customary for the

program manager to be involved in verification.  Prodotti argues that the program manager is the

de facto decision maker and the manager's involvement "raises questions as to the validity of the

determination."   Prodotti does not explain further but, instead, suggests that it was singled out

for participation by the program manager.[17]  Even if true, the complications surrounding

Prodotti's questionnaire responses would reasonably explain the need for additional oversight.

Regardless, Prodotti cites no provision precluding participation of a project manager in

verification.   The court finds no error in this regard.

## H.  Interest Rate

Prodotti argues that Commerce should have used Italian interest rates in determining its

interest expenses for "circumstances of sale" adjustments.  In calculating NV, Commerce must

take into consideration any differences in the circumstances of sale between the home market and

the U.S. market.  19 U.S.C. §1677b (a)(6)(C).  Circumstances of sale adjustments include credit

expenses.  NTN Bearing Corp. of America v. United States, 104 F. Supp. 2d 110, 122 (Ct. Int'l

Trade 2000).  These imputed credit expenses are to be calculated with the short-term interest rate

tied to the currency of sale.  Import Administration Policy Bulletin 98.2 at 4.  Commerce submits

that it used the Italian interest rate for those sales transacted in lira, and the U.S. interest rate for

those sales transacted in dollars.  Prodotti argues that, because all of entries were in lira, the

Italian interest rate should be applied to all sales, even those made in dollars.  The court finds that

Commerce properly applied the U.S. interest rate to dollar sales and the Italian interest rate to

sales in lira.  There was no error.

## I.  Disclosure untimely/incomplete

Prodotti asserts that Commerce did not disclose the calculations of the dumping margins

in a timely manner.  19 C.F.R. § 351.224(b) requires that Commerce disclose the calculations

performed in connection with a preliminary report within five days of the announcement.

---

[17]  Prodotti cites the Third Party Verification Reports, which states that in all other verifications in Italy, the manager did not participate.  Id.

Prodotti concedes that Commerce provided the computer program used to calculate the margins within five days and that Commerce later provided additional print-outs of some calculations at Prodotti's request. Prodotti argues that the initial disclosure of the computer program alone was insufficient to satisfy § 351.224(b) and that Commerce's later release of various print-outs were incomplete and untimely. Prodotti claims that this non-disclosure affects its ability to comment effectively on the issue.

Disclosure of a diskette with the margin program is sufficient to satisfy § 351.224(b). See Sugiyama Chain Co. v. United States, 852 F. Supp. 1103, 1115 (Ct. Int'l Trade 1994) ("complete computer printouts of Commerce's calculations not required"); see also Torrington Co. v. United States, 786 F. Supp. 1027, 1030 (Ct. Int'l Trade 1992). Commerce submitted the diskette to Prodotti within five days and, therefore, submitted the information in a timely manner. Commerce need not provide full print-outs of all calculations. Voluntary disclosures were, at worst, supplements to original disclosure. Regardless, Prodotti was provided sufficient information to respond. Moreover, Prodotti has not demonstrated how it was actually prejudiced by any delinquent disclosure.

**J. Pasta Shape Analysis**

As a final matter, Prodotti claims that Commerce's analysis of various pasta products was erroneous. Prodotti argues that Commerce improperly separated similar pasta products. After review of Prodotti's claim, Commerce voluntarily requests that this specific issue be remanded for further analysis. Prodotti requests that the court remand the issue with a special instruction to group particular pasta shapes. The court will not presume, however, that an agency will incorrectly analyze an issue on remand.

"[A]dministrators 'are assumed to be men of conscious and intellectual discipline,

capable of judging a particular controversy fairly on the basis of its own circumstances.'" [Withrow v. Larkin, 421 U.S. at 35, 55 (1975)] (quoting [United States v. Morgan, 313 U.S. 409, 421 (1941)]). Were we routinely to accept challenges to the administrative decision-making process based on claims of prejudgment, we would undermine the presumption that administrators fulfill their obligations with the highest level of integrity and honesty.

NEC Corp. v. U.S., 151 F.3d 1361, 1373 (Fed. Cir. 1998). Moreover, Commerce's assent to remand without argument implies that it intends to consider the matter in good faith. Prodotti will have sufficient opportunity to challenge the remand results if unhappy with the outcome.

## CONCLUSION

For the reasons discussed, the court remands this matter on the sole issue of pasta shape analysis. While some of Prodotti's challenges to Commerce's methodologies may have theoretical merit, the court finds that Prodotti has failed to show how it was prejudiced. Other challenges are simply unsubstantiated. Commerce shall issue its Remand Determination on or before August 16, 2002. Objections may be made within 20 days thereafter. Parties may submit comments on those objections within 10 days after objections are due.


                                                    Jane A. Restani
                                                         Judge

Dated: New York, New York

        This 16th day of July, 2002.

**ERRATA**

<u>Prodotti Alimentari Meridionali, S.r.L. v. United States</u>, Court No. 01-00020, Slip Op. 02-68, dated July 16, 2002.

In the twenty-third line on page 1, replace the word "Michelle" with the word "Michele".