OLYMPIA INDUSTRIAL, INC., Plaintiff,

v.

The UNITED STATES, Defendant,

and

Woodings–Verona Tool Works, Inc., Defendant–Intervenor.

Slip Op. 98–49.

Court No. 95–10–01339.

United States Court of International Trade.

April 17, 1998.

Graham & James (Lawrence R. Walders, Jeffery B. Denning), Washington, DC, for Olympia Indus., Inc.

Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Lesleyanne Koch Kessler), Office of the Chief Counsel for Import Administration, United States Department of Commerce (Karen L. Bland), of counsel, Washington, DC, for Defendant.

Wiley, Rein & Fielding (Charles Owen Verrill, Jr., Alan H. Price, Willis S. Martyn III), Washington, DC, for Defendant-Intervenor Woodings–Verona Tool Works, Inc.

## OPINION

GOLDBERG, Judge.

In this action, the Court reviews the Department of Commerce's ("Commerce") Remand Determination of the *Notice of Final Results of Administrative Review: Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, from the People's Republic of China,* 60 Fed.Reg. 49,251 (Sept. 22, 1995) ("Final Results"). Plaintiff, Olympia Industrial Inc. ("Olympia"), a respondent in the underlying administrative review, contests one aspect of the Remand Determination. The Court exercises jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994). The Court sustains the Remand Determination in part, and remands in part.

### I.

### BACKGROUND

Olympia, a U.S. importer of heavy forged hand tools ("HFHTs") from the People's Republic of China ("PRC"), and defendant-intervenor, Woodings–Verona Tool Works, Inc. ("Woodings"), a U.S. producer of HFHTs and petitioner in the underlying agency action, commenced this consolidated case under 19 U.S.C. § 1516a and 28 U.S.C. § 2631(c) (1994) seeking judicial review of certain por-

tions of the Final Results of Commerce's second administrative review. *See Olympia Indus., Inc. v. United States,* 21 CIT ——, 1997 WL 181529 (Apr. 10, 1997) (*"Olympia I"*). In *Olympia I,* both parties disputed the dumping margin results in the Final Results, focusing on certain values employed by Commerce when it calculated the foreign market value ("FMV") of the HFHTs imports using a factors of production ("FOP") analysis.[1] More specifically, Woodings challenged Commerce's Final Results on the grounds that Commerce erred when it (1) rejected certain Indian surrogate data based on a comparison of data from other market economy countries, and (2) valued shipping pallets that were assembled by the importer's suppliers based on surrogate data for the value of a finished pallet. On the other hand, Olympia alleged that Commerce erred when it (1) used surrogate country data to value the steel input when viable PRC import data was available, and (2) calculated inland freight expenses based on the longest distance between input suppliers to factory.

For the reasons discussed in *Olympia I,* the Court rejected Woodings arguments but accepted Olympia's challenges to the Final Results, and thus remanded two issues to Commerce. First, the Court agreed with Olympia that Commerce erred when it relied on surrogate country data to value the steel inputs. Accordingly, the Court instructed Commerce to solicit information bearing on whether the import data submitted by PRC trading companies is reliable. The Court then directed Commerce to use this information "to either change its methodology [for valuing steel inputs in its FOP analysis] or provide a clearly articulated rationale" explaining why the PRC import data from the trading companies should not be used. *Olympia I,* 21 CIT at ——, 1997 WL 181529 at *3. Second, the Court also agreed that Commerce erred in calculating inland freight; therefore, the Court instructed Commerce to reopen the record so parties could submit information on the percentage of steel purchased from suppliers and on the distances between suppliers and manufacturers. The Court further directed Commerce to adjust its inland freight calculation using the supplemented data.

In its Remand Determination, Commerce complied with the latter remand instruction, but not the former. On remand, Commerce did not seek additional information from the parties as to the reliability of the PRC steel import data. Rather, Commerce rejected the data in its entirety without review. In doing so, Commerce stated that its policy was only to evaluate inputs sourced from market-economy suppliers when those inputs are actually purchased by the NME manufacturer. *Remand Determination,* at 8–9. Because the import data at issue related to inputs purchased by NME trading companies, not by NME manufacturers, Commerce declined to solicit new information or to use the existing PRC import data. Commerce then concluded that "because there are no actual market-based prices for steel purchases by the manufacturer, we continue to use surrogate country data to value the steel input used in the production of HFHTs." *Remand Determination,* at 9–10.

Olympia objects to this aspect of the Remand Determination. Specifically, Olympia contends that Commerce's Remand Determination fails to use data that is the best information available to value one of the factors of production. The question thus posed is whether under the governing statute, is it reasonable for Commerce to ignore what is purportedly the best information available and instead resort to surrogate data when it employs a NME factors of production analysis?

## II.

### STANDARD OF REVIEW

Commerce's remand determination will be sustained if it is supported by substantial

---

**1.** If Commerce cannot determine a FMV for a nonmarket economy ("NME") respondent under the general provisions of 19 U.S.C. § 1677b(a), pursuant to 19 U.S.C. § 1677b(c)(1), Commerce must instead use the FOP methodology to estimate FMV for the merchandise in question. In the administrative review on appeal, Commerce resorted to a FOP analysis. *See Final Results,* 60 Fed.Reg. at 49,251–52. The PRC is a NME, and neither party disputes Commerce's decision to pursue a FOP investigation.

evidence on the record and is otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1994).

■ Although well told, to determine whether Commerce's interpretation of the statute is in accordance with law, the court applies the two-step test set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *Chevron* first directs the court "to determine whether Congress has directly spoken to the precise question at issue." *Id.* at 842–43, 104 S.Ct. 2778 (internal quotations and citations omitted). If the statute is unambiguous as to the issue at hand, then the court must give effect to the intent of Congress. *Id.* However, "[i]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on.a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778 (footnote omitted). Thus, the second element of the *Chevron* test directs the court to consider the reasonableness of an agency's interpretation.

■ If asked to review Commerce's factual findings, the court will uphold the agency if its findings are supported by substantial evidence. "Substantial evidence is something more than a 'mere scintilla,' and must be enough reasonably to support a conclusion." *Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 405, 636 F.Supp. 961, 966 (1986) (citations omitted), *aff'd.,* 5 Fed. Cir. (T) 77, 810 F.2d 1137 (1987). In applying this standard, the court affirms Commerce's factual determinations so long as they are reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusions. *Atlantic Sugar, Ltd. v. United States,* 2 Fed. Cir. (T) 130, 744 F.2d 1556, 1563 (1984).

### III.

### *DISCUSSION*

#### A. *Import Data for Steel Input Valuation*

■ Commerce correctly points out that this issue turns upon the second prong of the *Chevron* test. The relevant statute, 19 U.S.C. § 1677b(c)(1) (1988), does not clearly delineate how Commerce should determine what constitutes the best information available. Hence, the Court must consider whether Commerce's outright rejection of the PRC trading companies' data without assessing its reliability or accuracy is reasonable. While the Court recognizes the difficulty of selecting a methodology that produces reasonably accurate estimates of the true factors of production in a NME case, it cannot conclude that Commerce's failure to inquire into the reliability of the data without explanation is reasonable.

The Court begins its discussion by turning to the relevant statute. Section 1677b(c)(1) provides:

If -

(A) the merchandise under investigation is exported from a nonmarket economy country, and

(B) the administering authority finds that available information does not permit the foreign market value of the merchandise to be determined under subsection (a) of this section, the administering authority shall determine the foreign market value of the merchandise on the basis of the value of the factors of production utilized in producing the merchandise and to which shall be added an amount for general expenses and profit. . . . Except as provided in paragraph (2), the valuation of factors shall be based upon the best available information regarding the values of such factors in a market economy or countries considered to be appropriate by the administering authority.

19 U.S.C. § 1677b(c)(1) (1988).

■ From the statute, it is clear that Commerce must identify and use the best information available when it values the factors of production. As should be apparent, the rationale for using the best information available is to obtain the most accurate dumping margin possible. *See, e.g., Writing Instrument Mfrs. v. United States,* 21 CIT ——, ——, 984 F.Supp. 629, 637 (1997). Indeed, accuracy is the touchstone of the antidumping statute. *See Rhone Poulenc, Inc. v.*

*United States,* 8 Fed. Cir. (T) 61, 67, 899 F.2d 1185, 1191 (1990). Thus, when Commerce uses the best information available to value the factors of production it acts in consonance with the statute.

■ Here, one of the trading company respondents submitted data it believed to be the best information available on the value of steel inputs used by the PRC HFHTs manufacturers. This data consisted of market-based prices paid by PRC trading companies to suppliers in market economies. In its Remand Determination, however, Commerce summarily rejected this data, stating that it was not its policy to rely on market-economy data for inputs purchased by NME trading companies, only market-economy data for inputs purchased by NME producers. *See Remand Determination,* at 9–10. This decision was not reasonable in view of the statute. Commerce has an obligation to review all data and then determine what constitutes the best information available or, alternatively, to explain why a particular data set is not methodologically reliable. Here, Commerce failed to do either.

Instead, Commerce rejected the PRC trading company data in its entirety, concluding that "[p]rices paid by the trading companies do not represent prices paid by the manufacturers." *Remand Determination,* at 9. Standing alone, this statement wholly fails to explain why trading company data is never reliable for purposes of a FOP analysis. As developed below, neither the trading company data rejected by Commerce nor the surrogate country data used by Commerce actually represents the PRC manufacturers' true factors of production. Notwithstanding this, Commerce makes no attempt to explain why the latter is inherently more reliable or accurate than the former.

In its brief to this Court, Commerce also offered the post-hoc rationale that using trading company data, rather than data from producers, to value inputs in a FOP case would be inconsistent with Commerce's procedure in a normal cost of production ("COP") case. This argument obscures an important distinction. At the outset, the statute prescribes different methods for conducting a FOP analysis as compared to a COP analysis. *Compare* 19 U.S.C. § 1677b(c)(1) & (4) (allowing surrogate values to be used in valuing factors of production), *with* 19 U.S.C. § 1677b(e) (requiring that actual costs be used in a COP investigation). *See also Rhone–Poulenc, Inc. v. United States,* 20 CIT ——, ——, 927 F.Supp. 451, 462–63 (1996) (citing Commerce's Anti-dumping Manual, Ch. 8, sec. XVI, for the proposition that NME cases are often methodologically distinct from market economy cases). *See also* Jeffrey S. Neeley, *Nonmarket Economy Import Regulation: From Bad to Worse,* 20 Law and Pol'y Int'l Bus. 529, 531 (1989) ("When NMEs are involved, ... foreign market value has been determined in a radically different way, by a methodology that is as unpredictable as any known to trade law, perhaps to any area of the law.").

In stark contrast to COP cases, the surrogate values used by Commerce in NME FOP cases are fictional.[2] Indeed, Commerce here relied upon surrogate country data from India to value the steel inputs. *See Final Results,* 60 Fed.Reg. at 49,254. As with the surrogate country data, it may be true that the trading company data does not represent actual prices paid for the steel input by the PRC HFHTs manufacturers. And, in this sense, the use of trading company data would also create a fiction. That is, a surrogate figure again would be used to value a certain factor of production. Yet, nowhere does Commerce articulate a clear rationale as to why it is methodologically unsound to use the trading company data, albeit fictional, to value certain factors of production. Quite simply, Commerce has failed to explain why the trading company data can never be used as the best information available.

Moreover, Commerce's decision is inconsistent with the court's opinion in *Lasko Metal Prods., Inc. v. United States,* 16 CIT 1079, 810 F.Supp. 314 (1992), *aff'd,* 43 F.3d 1442 (1994). The court in *Lasko* reasoned that

---

**2.** Although fictional, this court has repeatedly upheld the use of surrogate data to value certain factors of production when it amounts to the best available information. *See, e.g., Tehnoimportexport, UCF America, Inc. v. United States,* 16 CIT 13, 16, 783 F.Supp. 1401, 1405 (1992).

"[t]he cost for raw materials from a market economy supplier, paid in convertible currencies, provides Commerce with the closest approximation of the cost of producing the goods in a market economy." *Lasko,* 16 CIT at 1081, 810 F.Supp. at 317. The same holds true here with respect to the trading company data. The import data at issue relates to inputs sourced from market-economy suppliers and paid for in convertible currencies. Commerce fails to offer a reason why relying on this market-based data somehow produces less accurate results than using other surrogate data. *See Lasko,* 16 CIT at 1081, 810 F.Supp. at 317 ("Only if the combination of surrogate values and market-based values somehow produces less accurate results would Commerce's use of this information be unreasonable."). Therefore, the Court concludes that Commerce's decision to reject the trading company data as not representative of the best information, without review or without an articulated rationale, is not a reasonable interpretation of the statute.

Of course, ultimately it may be the case that the import data submitted by the trading companies is not the best information available. That is, on remand the trading company data may prove to be unreliable. Indeed, the Court is aware that the existing record contains conflicting information on the reliability of the PRC trading company data. *Compare* Pl.'s Mem. in Supp. of Mtn. for S.J. (June 19, 1996), at 15, n. 9 (noting that at least one trading company informed Commerce that it sold imported steel to the HFHTs manufacturers during the period of review ("POR")), *with* Def.-Int.'s Rep. Br. (Aug. 19, 1996), at 4 (noting that the trading companies submitted contradictory statements on whether the HFHTs producers actually used the imported steel to produce subject merchandise during the POR). The entire purpose of the first remand was to afford Commerce the opportunity to establish the reliability of the trading company data and thereby to determine if it is the best information available. Simply disregarding data that purports to be the best information available without more does not

amount to a reasonable policy to which the Court should give deference. In sum, Commerce's decision to reject the data without further investigation or explanation is not reasonable in view of the statute's mandate to reach the most accurate result. Because the Court finds that Commerce's decision was not reasonable, there is no need to consider whether the decision was supported by substantial evidence on the record.

Accordingly, the Court remands to Commerce again to consider whether the PRC trading companies' steel input data is the best information available. Commerce therefore should reopen the administrative record to inquire as to the reliability of the PRC import data submitted by the trading companies.[3]

### B. *Longest Distance Between Input Suppliers and Factory*

In accordance with the Court's instructions, Commerce reopened the record on remand and sought information relating to the percentage of steel sourced by the PRC HFHTs manufacturers from various suppliers, and the distances between the manufacturers and suppliers. Using this information, Commerce corrected its inland freight adjustment in the Remand Determination. Neither plaintiff nor defendant-intervenor submitted comments on this issue; therefore, the Court sustains this part of Commerce's Remand Determination.

### IV.

### *CONCLUSION*

The Court again remands the Final Results with respect to Commerce's use of surrogate country data to value the steel input when PRC import data is available. All other aspects of Commerce's Remand Determination are sustained. A separate order will be entered accordingly.

### *ORDER*

Upon consideration of the Remand Determination of the United States Department of

---

**3.** The Court notes that this remand instruction is not the same as that prayed for by plaintiff. Rather than remand to Commerce to accept the steel input data without further inquiry, as plaintiff would have, Commerce still has an obligation to assess the reliability of the data.

Commerce's second administrative review covering the period February 1, 1992 through January 31, 1993 in *Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, from the People's Republic of China,* 60 Fed. Reg. 49,251 (Sept. 22, 1995); plaintiff's comments on the Remand Determination; defendant's reply comments thereto; upon all other papers and proceedings had herein, and upon due deliberation, it is hereby

**ORDERED** that Commerce's Remand Determination is remanded for reconsideration in accordance with the Court's *OPINION.* Commerce is instructed to reopen the administrative record to assess the reliability of the PRC trading company steel input data and, thereafter, to determine if this data is the best information available to value the steel input factor of production;

**ORDERED** that Commerce's Remand Determination is sustained with respect to the revised calculation of inland freight expenses; and it is further

**ORDERED** that Commerce's remand results are due to be filed within sixty (60) days from the date of this *ORDER.* Any comments or responses by the parties to the remand results are due on or before (20) days thereafter, and shall be limited to thirty-five (35) pages. Any rebuttal comments are due twenty (20) days thereafter, and shall be limited to thirty-five (35) pages.