**Slip-Op 04-123**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS**

_____

|   |   |   |
|---|---|---|
| GLOBE METALLURGICAL, INC. and SIMCALA, INC., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | Consol. Court No. |
| Defendant, | : | 03-00202 |
| | : | |
| and | : | |
| | : | |
| BRATSK ALUMINIUM SMELTER and RUAL TRADE LIMITED, | : | |
| | : | |
| Defendant-Intervenors. | : | |

_____ :

This consolidated action concerns the claims raised by plaintiffs, Globe Metallurgical, Inc. and SIMCALA, Inc. (collectively, "Plaintiffs"), and defendant-intervenors, Bratsk Aluminium Smelter and Rual Trade Limited (collectively, "Defendant-Intervenors"), who move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging the Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled <u>Notice of Final Determination of Sales at Less Than Fair Value for Silicon Metal From the Russian Federation</u>, ("<u>Final Determination</u>"), 68 Fed. Reg. 6,885 (Feb. 11, 2003), as amended by <u>Notice of Amended Final Determination of Sales at Less Than Fair Value for Silicon Metal From the Russian Federation</u>, ("<u>Amended Final Determination</u>") 68 Fed. Reg. 12,037 (Mar. 13, 2003).

Plaintiffs challenge two aspects of the <u>Final Determination</u>. First, Plaintiffs argue that Commerce improperly excluded a surrogate value cost of recycled fines from the calculation of normal value ("NV") and ultimately understated NV and the dumping margin. Second, Plaintiffs contend that Commerce improperly rejected a non-aberrational Egyptian surrogate market economy price of imported wood charcoal and, therefore, violated past agency practice.

Defendant-Intervenors contend that 19 U.S.C. § 1677b (2000), regulations promulgated by Commerce, and caselaw do not require Commerce to base factor values on prices in a surrogate country that are different from the country under investigation. Defendant-Intervenors also contend that Commerce failed to use the best available information when determining not to use post non-market economy ("NME") Russian values for the period of investigation ("POI"). Defendant-Intervenors argue that Commerce improperly calculated NV by failing to use the post-NME Russian values in evaluating the reliability of potential surrogate values.

**Held:** The anti-dumping duty statute does not foreclose Commerce from using a former NME—now market economy—country's values to calculate NV for the same country's factors of production during a POI in which the country was an NME country. Consequently, Commerce failed to sufficiently explain its exclusion of market economy Russian values for silicon metal. Commerce must explain why market economy Russian values are not the best available information. Commerce must also explain its decision to exclude recycled silicon metal fines as a factor of production for the production of silicon metal. Commerce properly rejected Egyptian values and chose values from Thailand for wood charcoal.

[Plaintiff's 56.2 motion is denied in part. Case remanded.]

Date: September 24, 2004

Piper Rudnick LLP, (William D. Kramer and Clifford E. Stevens, Jr.), for Globe Metallurgical, Inc. and SIMCALA, Inc., plaintiffs.

Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director; Jeanne E. Davidson, Deputy Director; Commercial Litigation Branch, Civil Division, United States Department of Justice (Michael Panzera); of counsel: Jonathan J. Engler, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for the United States, defendant.

Shearman & Sterling LLP, (Jeffrey M. Winton and Sam J. Yoon and Quentin M. Baird), for Bratsk Aluminium Smelter and Rual Trade Limited, defendant-intervernors.

## OPINION

**TSOUCALAS, Senior Judge:**  This consolidated action concerns the claims raised by plaintiffs, Globe Metallurgical, Inc. and SIMCALA, Inc. (collectively, "Plaintiffs"), and defendant-intervenors, Bratsk Aluminium Smelter and Rual Trade Limited (collectively, "Defendant-Intervenors"), who move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging the Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled <u>Notice of Final Determination of Sales at Less Than Fair Value for Silicon Metal From the Russian Federation</u>, ("<u>Final Determination</u>"), 68 Fed. Reg. 6,885 (Feb. 11, 2003), as amended by <u>Notice of Amended Final Determination of Sales at Less Than Fair Value for Silicon Metal From the Russian Federation</u>, ("<u>Amended Final Determination</u>") 68 Fed. Reg. 12,037 (Mar. 13, 2003).

Plaintiffs challenge two aspects of the <u>Final Determination</u>. First, Plaintiffs argue that Commerce improperly excluded a surrogate value cost of recycled fines from the calculation of normal value ("NV") and ultimately understated NV and the dumping margin.  Second, Plaintiffs contend that Commerce improperly rejected a non-aberrational Egyptian surrogate market economy price of imported wood charcoal and, therefore, violated past agency practice.

Defendant-Intervenors contend that 19 U.S.C. § 1677b (2000), regulations promulgated by Commerce, and caselaw do not require Commerce to base factor values on prices in a surrogate country that are different from the country under investigation. Defendant-Intervenors also contend that Commerce failed to use the best available information when determining not to use post non-market economy ("NME") Russian values for the period of investigation ("POI"). Defendant-Intervenors argue that Commerce improperly calculated NV by failing to use the post-NME Russian values in evaluating the reliability of potential surrogate values.

**BACKGROUND**

This case concerns the antidumping duty order on silicon metal from Russia for the POI covering July 1, 2001, through December 31, 2001. See Final Determination, 68 Fed. Reg. at 6,885. Commerce initiated the investigation on April 3, 2002. Notice of Initiation of Antidumping Duty Investigation for Silicon Metal From the Russian Federation, 67 Fed. Reg. 15,791 (Apr. 3, 2002). On April 30, 2002, Commerce issued a memorandum identifying the Philippines, Egypt, Thailand, Columbia, and Tunisia as appropriate surrogate countries for Russia. See Pls.' App. Br. Supp. Mot. J. Upon Agency R. ("Globe's App.") at Ex. 7. On June 6, 2002, in a separate proceeding, Commerce determined to treat Russia as a market economy country effective April 1, 2002, three months after the end of the

POI.  <u>See</u> Globe Metallurgical, Inc. SIMCALA, Inc.'s Br. Opp'n
Brastk's Mot. J. Upon Agency R. ("Globe's Opp'n Br.") at 5.  On
September 20, 2002, Commerce published its preliminary
determination, finding that silicon metal from Russia was being
sold at less-than-fair-value.  <u>Notice of Preliminary Determination</u>
<u>of Sales at Less Than Fair Value and Postponement of Final</u>
<u>Determination for Silicon Metal From the Russia Federation</u>
("<u>Preliminary Determination</u>"), 67 Fed. Reg. 59,253 (Sept. 20,
2002).  For its <u>Preliminary Determination</u>, Commerce selected Egypt
as the primary surrogate country.  <u>See</u> <u>id.</u>  On February 11, 2003,
Commerce published its final determination.  <u>See</u> <u>Final</u>
<u>Determination</u>, 68 Fed. Reg. at 6,885. Commerce subsequently
published an amended final determination on March 13, 2003.  <u>See</u>
<u>Amended Final Determination</u>, 68 Fed. Reg. at 12,037.


## JURISDICTION

The Court has jurisdiction over this matter pursuant to 19
U.S.C. § 1516a(a) (2000) and 28 U.S.C. § 1581(c) (2000).


## STANDARD OF REVIEW

In reviewing a challenge to Commerce's final determination in
an antidumping administrative review, the Court will uphold
Commerce's determination unless it is "unsupported by substantial
evidence on the record, or otherwise not in accordance with law .

. . ." 19 U.S.C. § 1516a(b)(1)(B)(I) (2000).

## I.    Substantial Evidence Test

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (S. Ct. 1951) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (S. Ct. 1938)). Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966) (citations omitted). Moreover, "the court may not substitute its judgment for that of the [agency] when the choice is 'between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'" American Spring Wire Corp. v. United States, 8 CIT 20, 22, 590 F. Supp. 1273, 1276 (1984) (quoting Penntech Papers, Inc. v. NLRB, 706 F.2d 18, 22-23 (1st Cir. 1983) (quoting, in turn, Universal Camera, 340 U.S. at 488)).

## II.    Chevron Two-Step Analysis

To determine whether Commerce's interpretation and application of the antidumping statute is "in accordance with law," the Court must undertake the two-step analysis prescribed by Chevron U.S.A.

Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). Under the first step, the Court reviews Commerce's construction of a statutory provision to determine whether "Congress has directly spoken to the precise question at issue." Id. at 842. "To ascertain whether Congress had an intention on the precise question at issue, [the Court] employ[s] the 'traditional tools of statutory construction.'" Timex V.I., Inc. v. United States, 157 F.3d 879, 882 (Fed. Cir. 1998) (citing Chevron, 467 U.S. at 843 n.9). "The first and foremost 'tool' to be used is the statute's text, giving it its plain meaning. Because a statute's text is Congress' final expression of its intent, if the text answers the question, that is the end of the matter." Id. (citations omitted). Beyond the statute's text, the tools of statutory construction "include the statute's structure, canons of statutory construction, and legislative history." Id. (citations omitted); but see Floral Trade Council v. United States, 23 CIT 20, 22 n.6, 41 F. Supp. 2d 319, 323 n.6 (1999) (noting that "not all rules of statutory construction rise to the level of a canon") (citation omitted).

If, after employing the first prong of Chevron, the Court determines that the statute is silent or ambiguous with respect to the specific issue, the question for the Court becomes whether Commerce's construction of the statute is permissible. See

Chevron, 467 U.S. at 843. Essentially, this is an inquiry into the reasonableness of Commerce's interpretation. See Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1038 (Fed. Cir. 1996). Provided Commerce has acted rationally, the Court may not substitute its judgment for the agency's. See Koyo Seiko Co. v. United States, 36 F.3d 1565, 1570 (Fed. Cir. 1994) (holding that "a court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another"); see also IPSCO, Inc. v. United States, 965 F.2d 1056, 1061 (Fed. Cir. 1992). The "Court will sustain the determination if it is reasonable and supported by the record as a whole, including whatever fairly detracts from the substantiality of the evidence." Negev Phosphates, Ltd. v. United States, 12 CIT 1074, 1077, 699 F. Supp. 938, 942 (1988) (citations omitted). In determining whether Commerce's interpretation is reasonable, the Court considers the following non-exclusive list of factors: the express terms of the provisions at issue, the objectives of those provisions, and the objectives of the antidumping scheme as a whole. See Mitsubishi Heavy Indus. v. United States, 22 CIT 541, 545, 15 F. Supp. 2d 807, 813 (1998).

## BACKGROUND

### I.   Factual Background

During the Cold War, Commerce considered the Soviet Union an NME country, a status Russia inherited. On June 6, 2002, Commerce

determined that Russia had shifted to a market economy and revoked Russia's NME status. See Br. Bratsk Aluminum Smelter & Rual Trade Ltd. Supp. R. 56.2 Mot. J. Agency R. ("Bratsk's Br.") at Ex. 1. Effective April 1, 2002, Russia was treated as a market economy country by Commerce.[1] See id. On March 7, 2002, however, two United States producers filed a petition alleging that imports of silicon metal from Russia were being sold in the United States at less-than-fair-value. Commerce began its investigation on April 3, 2002 and used its NME methodology during the investigation because the POI predated the effective date of Russia's new status. See Def.'s Mem. Opp'n Pls.' Mot. J. Upon Agency R. ("Commerce's Mem.") at 7.

---

[1] In determining to revoke Russia's NME status, Commerce stated:

> There will necessarily be a period of time during which antidumping duty rates, based on the non-market economy calculation methodology, will remain in effect. For existing antidumping duty orders, the non-market economy-based rates will remain in effect until they are changed as a result of a review, pursuant to [19 U.S.C. § 1675] of a sufficient period of time after April 1, 2002. For on going investigations, because the period of investigation pre-dates the effective date of this determination, [Commerce] will continue to utilize non-market economy methodologies in those investigations.

See Bratsk'S Br., Ex. 1 at 2.

Commerce identified a non-exclusive list of potential surrogate countries comparable to Russia in terms of economic development, based on the most recent available data. See Globe's Opp'n Br. at 3-4. This list included the Philippines, Egypt, Thailand, Columbia, and Tunisia. See id. Commerce permitted comments from silicon metal producers from Russia and the domestic industry regarding the factor values to be used in calculating NV. Plaintiffs identified Egypt as the most appropriate surrogate country while Defendant-Intervenors first identified South Africa and then post-NME Russia as possible surrogates for Russia. See id. at 4-5. Plaintiffs proposed that Commerce use a value for charcoal, an input into silicon metal, based on the 1998 United Nations Commodity Trade Statistics ("UNCTS") data for wood charcoal imported into Egypt. See Pls.' Br. Supp. Mot. J. Upon Agency R. ("Globe's Br.") at 11. Commerce rejected Egyptian values as unreliable and unusable because Egypt had negligible imports of wood charcoal in 1998 and 1999. See id. at 12-13. After reviewing UNCTS data for wood charcoal from Thailand, Colombia, the Philippines and Tunisia, Commerce selected Thai values because Thailand had a significant quantity of imports of wood charcoal. See Br. Bratsk Aluminum Smelter & Rual Trade Ltd. Resp. Pls.' R. 56.2 Mot. J. Agency R. ("Bratsk's Resp. Br.") at 10.[2]

_____

[2]     After the Preliminary Determination, Commerce gave the interested parties a final opportunity to submit additional

For the Final Determination, Commerce valued charcoal using a Thai import value, which was less than half of the Egyptian and South African charcoal values submitted by Plaintiffs and Defendant-Intervenors, respectively. See Globe's Br. at 14. The Thai values were also substantially lower than the surrogate values Commerce selected for valuing the less expensive reductants,[3] coal and petroleum coke. See id. Commerce used Thai import values because Thailand was the only potential surrogate with a significant quantity of imports of wood charcoal. See Commerce's Mem. at 11-12. In addition, Thailand produces steel which is comparable to silicon metal. See id.

Commerce rejected Defendant-Intervenors argument that Russian values should be used to value the factors of production and other expenses. See Globe's Opp'n Br. at 7. Commerce determined that Egypt's level of economic development and the merchandise produced is comparable to Russia. See Commerce's Mem. at 10. Commerce also found reasonably complete information for valuing the factors of

_____

information on the appropriate factor values. See Bratsk's Resp. Br. at 11. Plaintiffs submitted a value for charcoal obtained from an Egyptian ferroalloy company which produced ferrosilicon, a product very similar to silicon metal in terms of the production process and inputs. See Globe's Br. at 14.

[3]     Reductants such as coal, charcoal, and petroleum coke are used in the process of making silicon metal and, therefore, are all inputs considered to be factors of production. See Globe's Br. at 14.

production in Egypt. See id. Consequently, Commerce determined that Egypt was the appropriate primary surrogate country for Russia. See id. Commerce relied upon Egyptian price data from the UNCTS for 1998 or 1999. See id. Commerce declined to use post-NME Russian price data to value the factors of production for NME Russian. See id. Commerce explained that its NME methodology relies upon selecting a surrogate market economy to value the factors of production, which precludes the use of Russia itself as a source for surrogate values. See id. Commerce also rejected the use of post-NME Russian values as a "benchmark" with which to measure the reliability of potential surrogate values. See id. at 11-12. Commerce noted that in the past it has compared potential surrogate values to United States prices and world prices in determining whether the surrogate values are aberrational. See id.

## II. Statutory Background

In conducting an administrative review, Commerce determines the antidumping duty margin by taking the difference between NV and the United States price of the merchandise. When merchandise is produced in an NME country there is a presumption that exports are under the control of the state. Section 1677b(c) of Title 19 of the United States Code provides that, "the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or

countries considered to be appropriate by [Commerce]." 19 U.S.C. § 1677b(c)(1) (2000). The statute, however, does not define the phrase "best available information," it only provides that, "[Commerce], in valuing factors of production . . . shall utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries that are—(A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4). To determine the comparability of a market economy country's economic development with that of an NME country, Commerce "will place primary emphasis on per capita GDP as the measure of economic comparability." 19 C.F.R. § 351.408(b) (2001). Nonetheless, Commerce is given broad discretion "to determine margins as accurately as possible, and to use the best information available to it in doing so." Lasko Metal Prods., Inc. v. United States, 43 F.3d 1442, 1443 (Fed. Cir. 1994).

### DISCUSSION

**I. Commerce Failed to Sufficiently Justify Excluding Russian Values for Silicon Metal From Russia**

    **A. The Anti-dumping Duty Statute Does Not Foreclose Commerce from Using Market Economy Russian Values to Calculate Factors of Production**

The anti-dumping duty statute does not prohibit Commerce from using data from the same country, a market economy, in calculating

the NV when during the POI the country was an NME country.
Defendant-Intervenors contend that Commerce must consider Russian
market economy values in determining NV for Russian silicon metal.
See Bratsk's Br. at 11-18.  Plaintiffs and Commerce respond that
Russian values are unavailable for the calculation of NV because
Russia cannot serve as a surrogate country for itself.  See Globe's
Opp'n  Br. at 11-18; Commerce's Mem. at 16-25.  Accordingly,
Commerce asserts that it properly did not consider post-NME Russia
as a possible surrogate country.  See Commerce's Mem. at 16.  The
availability of the market economy Russian values arises out of
Commerce's interpretation and application of the antidumping
statute.  Consequently, the Court must undertake Chevron's two-step
analysis to determine if Commerce's interpretation of the statute
is permissible.  See Chevron, 467 U.S. at 837.

### 1.    Chevron's First Step

A Chevron analysis begins with an examination of the plain
language of the statute.  See Timex V.I., 157 F.3d at 882.  The
statute states in pertinent part:

> (1) In general
>    If—
>      (A) the subject merchandise is exported from a
> nonmarket economy country, and
>      (B) the administering authority finds that available
> information does not permit the normal value of the
> subject merchandise to be determined under subsection
> (a)of this section,
> the administering authority shall determine the normal
> value of the subject merchandise on the basis of the

value of the factors of production utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses. Except as provided in paragraph (2), the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority.

(2) Exception
    If the administering authority finds that the available information is inadequate for purposes of determining the normal value of subject merchandise under paragraph (1), the administering authority shall determine the normal value on the basis of the price at which merchandise that is—
    (A) comparable to the subject merchandise, and
    (B) produced in one or more market economy countries that are at a level of economic development comparable to that of the nonmarket economy country,

is sold in other countries, including the United States.

\*\*\*

(4) Valuation of factors of production
   The administering authority, in valuing factors of production under paragraph (1), shall utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries that are—
    (A) at a level of economic development comparable to that of the nonmarket economy country, and
    (B) significant producers of comparable merchandise.

19 U.S.C. § 1677b(c) (emphasis added).


Sections 1677b(c)(1) and (4) of Title 19 of the United States

Code specifically authorize, but do not require, Commerce to use

surrogate countries to calculate NV.  See Shakeproof Assembly

Components, Div. of Ill. Tool Works, Inc. v. United States, 268

F.3d 1376, 1381 (Fed. Cir. 2001). The statute requires that NV be calculated on the basis of the value of the factors of production utilized in producing the merchandise. See 19 U.S.C. § 1677b(c)(1). Valuation of the factors of production must be based on the best available information in a market economy country or countries considered to be appropriate by Commerce. See 19 U.S.C. § 1677b(c)(4). The statutory language is ambiguous because the word "considers" implies that Commerce is afforded a level of discretion in selecting appropriate countries for the calculation of NV. The statute, however, also requires that Commerce choose from the best available information. The statutory language does not plainly indicate whether market economy Russian values are available for calculating NME Russian factors of production. Accordingly, to determine the meaning of the statute, the Court must look to the tools of statutory construction, including "the statute's structure, canons of statutory construction, and legislative history." See Timex V.I, 157 F.3d at 882.

The structure of the antidumping duty statute does not indicate whether the values from Russia are available to calculate NME Russian factors of production. Commerce argues that while the antidumping duty statute does not specifically use the term "surrogate country," the statute clearly contemplates that the country selected cannot be the one under investigation because the

statute uses the term "comparable." See Commerce's Mem. at 17-18. The statute, however, only requires Commerce to determine NV from the values it selects from one or more market economy countries "to the extent possible." 19 U.S.C. § 1677b(c)(4) (emphasis added). When those values are not available or unreliable, Commerce is directed to use other information in order to calculate NV.[4] See Shakeproof, 268 F.3d at 1381. The Court of Appeals for the Federal Circuit has held that Commerce may reject surrogate values when there are other methods of determining the "best available information" regarding the values of the factors of production. See Lasko, 43 F.3d at 1446; see also Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1378 n.5 (Fed. Cir. 1999) (stating that the antidumping duty statute "does not preclude consideration of pricing or costs beyond the surrogate country if necessary").

The regulations also do not require the use of another country's values to serve as a surrogate. Moreover, the regulations do not preclude the use of the same country's market economy values in the evaluation of a POI during which the country was an NME. Commerce's regulations state that "[e]xcept for labor . . . [Commerce] normally will value all factors in a single

---

[4] Commerce notes that it "did accept actual Russian import prices paid by [Defendant-Intervenors] for inputs where those inputs were purchased from a market economy." See Commerce's Mem. at 11.

surrogate country" and, "[f]or manufacturing overhead, general expenses, and profit, [Commerce] normally will use non-proprietary information gathered from producers of identical or comparable merchandise in the surrogate country."  19 C.F.R. § 351.408(c)(2) & (4) (2001).  Commerce intends to use a "single surrogate country" to produce most of the values necessary to calculate NV.  See 19 C.F.R. § 351.408(c)(2).  The qualifier "normally," however, provides Commerce with the discretionary power to determine if a surrogate country is necessary.

The Court next examines the legislative history of the statute.  In 1979, Congress enacted Section 773 of the Tariff Act of 1930, encoded as 19 U.S.C. 1677b(1979), updating the language with minor modifications to the Antidumping Act of 1921.  See S. REP. No. 96-249 (1979).  From 1979 until 1988, Commerce was instructed to calculate NV using surrogate data when available. See 19 U.S.C. § 1677b(c) (1979).[5]  The 1988 Trade Act replaced the

---

[5]     In pertinent part, this section states that for state-controlled economies Commerce shall:

    determine the foreign market value of the merchandise on
    the basis of the normal costs, expenses, and profits as
    reflected by either—,
     (1) the prices determined in accordance with subsection
    (a) of this section, at which such or similar merchandise
    of a non-State-controlled-economy country or countries is
    sold either—,
          (A) for consumption in the home market of that
          country or countries, or
          (B)  to  other  countries,  including  the  United

surrogate country methodology for calculating NV on the basis of surrogate countries, in favor of a factors of production analysis. See 19 U.S.C. § 1677b(c). The surrogate methodology has been expressly abandoned by Congress as the primary means of evaluating NV for NME countries. Consequently, Commerce's contention that the statute contemplates the use of surrogate countries as the only means to calculate NV fails.

The shift from the surrogate method to the factors of production method reveals that Congress did not intend Commerce to exclusively rely on surrogate data. Rather, Congress intended Commerce to use other data when more appropriate. Congress instructs Commerce to "determine foreign market value using a constructed value methodology based on the factors of production utilized in producing the merchandise subject to investigation." H.R. Conf. Rep. No. 100-576, 590 (1988). Congress further states that "[t]he factors would be valued from the best available evidence in a market economy country (or countries) that is at a comparable level of economic development as the country subject to investigation and is a significant producer of the comparable

---

States; or
(2) the constructed value of such or similar merchandise in a non-State-controlled economy country or countries as determined under subsection (e) of this section.

19 U.S.C. § 1677b (1979).

merchandise.  Id.  In its valuation of factors of production,
"Commerce shall avoid using any prices which it has reason to
believe or suspect may be dumped or subsidized prices." Id.  The
Court finds that the statute and its legislative history are
ambiguous as to whether Commerce could use the values from post-NME
Russia to assess factors of production for the period during which
Russia was considered an NME country.  Accordingly, the Court must
undertake the second step of Chevron and determine if Commerce's
statutory interpretation appropriately filled the gap left by
Congress.

### 2.    Chevron's Second Step

The Court examines Commerce's interpretation of the statute
according to the following non-exclusive list of factors: "the
express terms of the provision at issue, the objectives of those
provisions and the objectives of the antidumping scheme as a
whole." Mitsubishi, 22 CIT at 545, 15 F. Supp. 2at 813.  Commerce
construes the statute to forbid the use of values from post-NME
Russia for the calculation of factors of production within a POI
during which Russia was considered an NME country.

The overarching goal of the antidumping duty statute is to
determined dumping margins as accurately as possible.  Rhone
Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir.

1990).  While Section 1677b(c)(1) does not directly address the situation when NME countries become market economy countries, the objective of the statute is to accurately predict NV as if the NME country was a market economy country.  See Crawfish Processors Alliance v. United States, 2004 Ct. Intl. Trade LEXIS 46, at *19 (CIT May 6, 2004) (stating that "Commerce's discretion in choosing its information is limited by the statute's ultimate goal 'to construct the product's normal value as it would have been if the NME country were a market economy country.'" (quoting) Rhodia Inc. v. United States, 25 CIT 1278, 1286, 185 F. Supp. 2d 1343, 1351 (2001)).  The goal of the statute is not punitive; the goal is to level the playing field for United States producers of similar goods with producers in an NME country.  See Allied Tube & Conduit Corp. v. United States, 24 CIT 1358, 1370, 127 F. Supp. 2d. 207, 218 (2000) (noting that "[a]ntidumping laws are not punitive in nature, but are designed to remedy the inequities caused by unfair trade practices").

The most accurate information, perhaps, in evaluating the factors of production from an NME country would be to turn that country into a market economy.  Commerce usually evaluates factors of production from a different country to determine the NV of a product from an NME country.  Under some circumstances, however, where the NME country has become a market economy, the post-NME

values will best serve as representative of the values of the NME country as if it were a market economy.  Because the purpose of the statute is remedial rather than punitive, and Commerce is directed to use the best information available, foreclosing the possibility of using accurate information would be contrary to the purpose of the statute.  There may be situations where information from a different country would be more reliable, accurate, and predictable for Commerce to use in calculating NV.  A country that becomes a market economy three months after the POI is uniquely comparable to the same country as an NME during the POI.  The post-NME Russian values satisfy the antidumping duty statute's requirement to use data collected from a market economy.  Accordingly, the Court finds that Commerce erred in not considering these values in its factors of production analysis.  Commerce should not have rejected these market economy values from Russia merely because the country had been considered an NME country in the recent past.   Rather, Commerce should have considered post-NME Russian data in making its determination as to what constitutes the best available information.

Congress does not speak to the situation when an NME country becomes a market economy country shortly after the POI.  Congress, however, requires Commerce to use the best available information in determining the most accurate, fair, and predictable calculations

of NV.  See Shakeproof, 268 F.3d at 1382 ("[T]he critical question is whether the methodology used by Commerce is based on the best available information and establishes antidumping margins as accurately as possible").  Congress has expressed its intent that Commerce make the most accurate determination possible with respect to NV.  Commerce's interpretation of the statute—as precluding the use of Russian market economy data in determining the factors of production for Russia when it was an NME country—is unreasonable. Accordingly, the Court finds that Russian market economy values were available for Commerce to calculate NV in the case at bar if Commerce determines that these values are the best information available.

**B.    Commerce Must Explain Why post-NME Russian Values Are Not the Best Available Information**

Defendant-Intervenors argue that the statutory requirement of best available information requires Commerce to use the post-NME Russian values to calculate NV.  See Bratsk's Br. at 13-15. Commerce and Plaintiffs respond that Commerce has the discretion to determine what constitutes the best available information.  See Commerce's Mem. at 19; Globe's Opp'n Br. at 14.  In the case at bar, Commerce used values from Egypt, Thailand, and South Africa. Commerce also selected Russian import values from market economy country suppliers as opposed to values from post-NME Russia.

Commerce based its decision to reject Russian values after April 1, 2002, because the POI ended three months earlier.  Commerce, however, has previously used factor values relating to a time period different from the POI.  See e.g., Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination for Non-Malleable Cast Iron Pipe Fittings From the People's Republic of China, 67 Fed. Reg. 60,214, 60,218 (Sept. 25, 2002); Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination for Carbon and Certain Alloy Steel Wire Rod From Ukraine, 67 Fed. Reg. 17,367, 17,373 (Apr. 10, 2002); Notice of Preliminary Determination of Sales at Less than Fair Value for Steel Concrete Reinforcing Bars from Moldova, 66 Fed. Reg. 8,333, 8,337-38 (Jan. 30, 2001).

The Egyptian values Commerce used were collected in 1999, which was at least a year and a half earlier than the POI.  See App. Br. Bratsk Aluminum Smelter & Rual Trade Ltd. Supp. Pls.' R. 56.2 Mot. J. Agency R. ("Bratsk's App.") at Ex. 2.  If the contemporaneous requirement is satisfied by values collected a year and a half earlier than the POI, then values collected three months after the POI should also meet the contemporaneous requirement. Commerce should have explained why the post-NME Russian data fails to satisfy the contemporaneous requirement in determining the reliability of the factors of production.  Commerce failed to fully

examine the reliability of the Russian values because it had determined that the Russian values were unavailable. The Court remands this issue to Commerce with instruction to use post-NME Russian values or explain why such values are not the best information available.

## II.  Commerce Properly Rejected Egyptian Values and Used Values from Thailand for Wood Charcoal

Plaintiffs contend that Commerce improperly valued charcoal using an understated Thai value. See Globe's Br. at 8. Plaintiffs argue that Egyptian charcoal values were not aberrational and, therefore, should have been used instead of the Thai charcoal values, which were aberrational and understated. See id. at 10. Commerce responds that the Egyptian charcoal values were appropriately excluded because they were aberrational. See Commerce's Mem. at 13. Commerce asserts that the Thai charcoal values were selected in accordance with law and based on substantial evidence. See id. at 29-31. For the reasons set forth below, the Court agrees with Commerce.

The antidumping duty statute requires Commerce to calculate NV by determining the values of the factors of production in an NME country using the best available information. See 19 U.S.C.

1677b(c).  The statute provides little guidance as to what constitutes best available information.  Consequently, Commerce is accorded "wide discretion in the valuation of factors of production in the application of those guidelines."  Nation Ford, 166 F.3d at 1377.  Thus, "Commerce need not prove that its methodology was the only way or even the best way to calculate surrogate values for factors of production as long as it was reasonable."  Shandong Huarong Gen. Corp. v. United States, 25 CIT 834, 840, 159 F. Supp. 2d 714, 721 (2001).  A court may measure Commerce's reasonableness by determining whether Commerce's actions are consistent with a past practice or stated policy, or if, in failing to do so, Commerce provides a reasonable explanation.  See Hebei Metals & Minerals Imp. & Exp. Corp. v. United States, 2004 Ct. Intl. Trade LEXIS 89, at *34-35 (CIT Jul. 19, 2004) (citing Citrosuco Paulista, S.A. v. United States, 12 CIT 1196, 1209 (1988)).

Pursuant to the best available information requirement, Commerce selects countries with similar economic characteristics, and uses values from the surrogate country to represent each factor of production.  See 19 C.F.R. § 351.408.  After selecting appropriate surrogate values, Commerce calculates NV by multiplying the reported quantities by the selected surrogate values for the different inputs.  Because the best available information requirement is only satisfied when the surrogate values evidence a

rational and reasonable relationship to the factor of production it represents, Commerce often uses more than one country to select surrogate values. See Olympia Industrial, Inc. v. United States, 22 CIT 387, 390, 7 F. Supp. 2d 997, 1001 (1998) ("Commerce has an obligation to review all data and then determine what constitutes the best available information or, alternatively, to explain why a particular data set is not methodologically reliable."). Commerce will disregard values from the primary surrogate country when it finds those values to be (1) unavailable; (2) not sufficiently contemporaneous; (3) of poor quality, or (4) otherwise unreliable, i.e., aberrational. Notice of Final Results of Antidumping Duty Administrative Review of Silicomanganese From the People's Republic of China, 65 Fed. Reg. 31,514 (May 18, 2000). Consequently, Commerce must compare the reliability of each potential surrogate country's values to determine which values are most reliable. See Olympia, 22 CIT at 390, 7 F. Supp. 2d at 1001.

In the case at bar, Commerce examined the import quantities and prices of wood charcoal imports to test the reliability of the values. See Commerce's Mem. at 26-29. Commerce determined that Egypt had low import quantities of wood charcoal, 24 metric tons in 1998 and 36 metric tons in 1999, and, therefore, disregard Egyptian values. See id. at 27-28. Choosing to disregard primary surrogate country values based upon aberrationally low import

quantities is consistent with a past practice of Commerce upheld by the Court.   See Anshan Iron & Steel v. United States, 2003 Ct. Intl. Trade Lexis 109, at *40 (CIT July 16, 2003) (stating that Commerce's decision to use a particular set of "values because it determined that Plaintiffs' imports . . . were too minimal to provide an adequate surrogate value for its substantial domestic purchases . . . was supported by substantial evidence and in accordance with law").  Commerce determined that the low quantities of Egyptian imports would distort its calculations.  Commerce's practice has been to "disregard small-quantity import data when the per-unit value is substantially different from the per-unit value of larger quantity imports of that product from other countries." Shakeproof Assembly Components Div. Of Ill. Tool Works, Inc. v. United States, 23 CIT 479, 485, 54 F. Supp. 2d 1354, 1360 (1999). In rejecting the use of Egyptian prices for wood charcoal, the Court finds that Commerce has satisfied its duty to provide a reasonable explanation for its determination.

Thai values for wood charcoal were chosen by Commerce because Thailand had a high volume of wood charcoal imports suggesting that the values were reliable.  See Bratsk's App., Ex. 2 at 19-20.  This explanation is consistent with Commerce's past practice to examine reliability of values based upon import quantities.  See Anshan, 2003 Ct. Intl. Trade Lexis 109, at *40.   Plaintiffs contend,

however, that the Thai wood charcoal values are aberattionally low because two other products, coal and petroleum coke, should be higher than the value of charcoal.  See Globe's Br. at 24. Plaintiffs note that the Russian producers reduced their reliance on charcoal in favor of coal and petroleum coke because these materials were cheaper.  See id.  The Court finds Plaintiffs arguments unpersuasive.  Plaintiffs fail to show that the 1999 Egyptian values for coal and petroleum coke which Commerce acceptedare in any way related to the 2001 value for wood charcoal from Russia, Egypt, and Thailand.  Moreover, the values for wood charcoal were calculated using UNCTS data whose numerical reliability is not in question.

In examining the contemporaneity of the potential surrogate values with the POI, Commerce determined that Thai wood charcoal values were the best available information.  Because the POI for this case was July to December 2001, the 2001 Thai values were more contemporaneous than the 1998 and 1999 Egyptian values.  While Thailand does not have a silicon metal industry, the wood charcoal values are acceptable because Thailand produces steel and refines primary and secondary metal, industries which Commerce determined are comparable.  See Bratsk's App., Ex. 2 at 19-20.  Therefore, Commerce reasonably explained its use of Thai values, as Thailand produced a "comparable merchandise" as required by 19 U.S.C. §

1677b(c).  Commerce's determination to use Thai values for wood charcoal is upheld as reasonable and in accordance with law.


### III. Commerce Must Explain Its Decision to Exclude Recycled Silicon Metal Fines as a Factor of Production

Plaintiffs contend that Commerce failed to include recycled silicon metal fines in the factor of production calculations for silicon metal from Russia.  See Globe's Br. at 18-21.  Commerce asks for an opportunity to explain its decision.  See Commerce's Mem. at 31-32.  Accordingly, the Court remands this issue to give Commerce the opportunity to explain its exclusion of recycled silicon metal fines from the factor of production cost analysis.


### CONCLUSION

The Court finds that Commerce's determination to use values for wood charcoal from Thailand is supported by substantial evidence and in accordance with law.  This case is remanded to Commerce with instructions (1) to use post-NME Russian values or explain why Russian values are not the best information available for the calculation of NV, and (2) to explain Commerce's exclusion

of recycled silicon metal fines from the factor of production cost analysis.


                                        ___/s/ Nicholas Tsoucalas___
                                          **NICHOLAS TSOUCALAS**
                                           **SENIOR JUDGE**


Dated:     September 24, 2004
           New York, New York